**Thomas G. WALLER and Myra L. Waller, individually; and Thomas G. Waller, as the administrator of the estate of Michael Jeffery Waller, deceased, Plaintiffs,**

**v.**

**Ozzy OSBOURNE; CBS Incorporated; CBS Records; Jet Records; Bob Daisley; Randy Rhoads; Essex Music International, Ltd.; Essex Music International, Incorporated, Defendants.**

Civ. No. 88–111–ALB/AMER(DF).

United States District Court
M.D. Georgia,
Albany/Americus Division.

May 6, 1991.

Ben B. Mills, Jr., Mills & Chasteen, Fitzgerald, Ga., for plaintiffs.

C. Richard Langley, Langley & Lee, Albany, Ga., David R. Aufdenspring, G. Patrick Watson, Powell, Goldstein, Frazier & Murphy, Atlanta, Ga., David Bass, Howard L. Weitzman, Katten, Muchin, Zavis & Weitzman, Los Angeles, Cal., for defendants.

FITZPATRICK, District Judge

Plaintiffs Thomas and Myra Waller in the above captioned action allege that the defendants proximately caused the wrongful death of their son Michael Jeffery Waller by inciting him to commit suicide through the music, lyrics, and subliminal messages contained in the song "Suicide Solution" on the album "Blizzard of Oz." Defendants deny all allegations of wrongdoing on their part and now have pending before the court a joint motion for summary judgment.

## I. BACKGROUND FACTS

Plaintiffs filed their original complaint in this case on April 28, 1988, following the death of their son Michael Jeffery Waller on May 3, 1986, as the result of a self-inflicted pistol wound to his head.[1] In that original complaint, plaintiffs alleged that their son's suicide occurred after he had

---

1. The pleadings in this case contain very little information about Michael Jeffery Waller and the events surrounding his death other than plaintiffs' description of him as a "troubled adolescent." Brief by Plaintiffs in Opposition to Defendants' Motion to Dismiss Plaintiffs' Complaint, p.2.

repeatedly listened to an Ozzy Osbourne cassette tape which contained audible and perceptible lyrics that directed Michael Waller to take his own life.[2] Plaintiffs' Complaint, ¶¶ 24, 27.

Defendants Ozzy Osbourne, CBS Inc., and CBS RECORDS Inc., responded to the plaintiffs' complaint by moving the court to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) because it failed to state a claim upon which relief could be granted. Before the court acted on the motion to dismiss, however, plaintiffs filed a motion to amend their complaint which the court authorized.

The modified complaint, (Plaintiffs' Amended Complaint), discarded the claim that the lyrics which allegedly incited their son to commit suicide were audible and perceptible and instead charged that those same lyrics represent a subliminal message that is consciously intelligible only when the music is electronically adjusted. Plaintiffs' Amended Complaint, ¶ 27. The amended complaint further alleges that as a result of the dissemination of the music, lyrics, and subliminal message in the song "Suicide Solution" on the album "Blizzard of Oz," defendants are liable to the plaintiffs for causing the pain and suffering of their deceased son; inciting his wrongful death; encouraging persons to physically harm themselves or commit suicide; and engaging in fraud, invasion of privacy, and nuisance. Plaintiffs' Amended Complaint, ¶¶ 40–54.

Defendants responded to plaintiffs' amended complaint by filing a joint motion to dismiss plaintiffs' complaint as amended. In addressing defendants' motion to dismiss in an order dated July 20, 1989, the court distilled plaintiffs' complaint down to the dispositive issue of whether or not the alleged subliminal message actually existed and, if so, were the defendants nevertheless protected from liability by the first amendment to the United States Constitution. The court granted plaintiffs the opportunity to pursue that issue through discovery and therefore denied defendants' motion to dismiss with the proviso that upon the completion of discovery the motion could be renewed in the form of a summary judgment motion.[3]

As the discovery phase of the case began, plaintiffs were confident that a subliminal message existed within a twenty-eight second interlude on the song "Suicide Solution."[4] Plaintiffs asserted, however, that the existence of the subliminal message could "only be confirmed by having an opportunity to test the multi-track masters and stereo masters of the entire tape of the album "Blizzard of Oz."[5] Plaintiffs' Response to Defendant CBS Records Inc's Second Interrogatories. Plaintiffs therefore requested that they be given the opportunity to have their expert examine the master tapes of the "Blizzard of Oz" album. Defendants consented to plaintiffs' request and on August 27, 1990, delivered the twenty-four track and stereo master

---

**2.** The alleged lyrics that were audible and perceptible during a twenty-eight second interlude in the song "Suicide Solution" on the album titled "Blizzard of Oz" went as follows:

Ah know people
You really know where it's at
You got it
Why try, why try
Get the gun and try it
Shoot, shoot, shoot.
Plaintiffs' Complaint, ¶ 22.

**3.** In the July 20, 1989 order, the court also denied Defendants' original Motions to Dismiss, Plaintiffs' Motion to Disallow Defendants' Joint Motion to Strike, and Defendants' Joint Motion to Strike.

**4.** At a status conference held on February 21, 1990, plaintiffs' attorney informed the court of

the following regarding the presence of a subliminal message in the song "Suicide Solution:"

We don't want for a minute to take the position that we are in this case looking for a subliminal message. We contend we have one. It is in the 28–second interlude,....

. . . . .

Transcript of February 21, 1990, status conference, pp.14–15.

**5.** Plaintiffs' contention that an analysis of the master tapes represented the only means of confirming the existence of a subliminal message was reiterated in a March 23, 1990 correspondence to the court in which plaintiffs' attorney states that "only by an examination of the masters can it be determined with certainty whether a subliminal exists anywhere on the entire tape...." Brief in Support of Defendants' Joint Motion for Summary Judgment, exh. 7, p.3.

tapes of the "Blizzard of Oz" album to the studio of the expert plaintiffs had hired to analyze the tapes.

The expert plaintiffs employed to examine the master tapes, Martin Hall, is a Santa Barbara High School graduate who has completed upper level history courses at the University of California at Santa Barbara. Hall Dep., p. 13. Mr. Hall is not an expert in mastering and mixing rock music, however, he had previously tested the commercial release of "Suicide Solution" for the plaintiffs in the case of *McCollum v. CBS, Inc.*, 202 Cal.App.3d 989, 249 Cal.Rptr. 187 (1988). Hall Dep., p. 65. That examination of "Suicide Solution" by Mr. Hall led him to conclude that the song did not contain subliminal messages but rather something he identified as "preconscious suggestions." Hall Dep. exh. 21, p. 2. That is a term he uses to describe something which is not the same as a subliminal message since, according to Hall, a subliminal message is not audible while a preconscious suggestion can be heard though not necessarily understood. Hall Dep. exh. 18, p. 2.

The preconscious suggestions Mr. Hall found were a series of lyrics which are "clearly audible but mostly unintelligible."[6] *Id.* Mr. Hall noted at that time, however, that his version of the alleged preconscious lyrics did involve "guess work" which could only be confirmed by examining the master tape of "Suicide Solution." Hall Dep. exh. 17.

In his role as an expert witness for the plaintiffs in this case, Mr. Hall was given the opportunity to confirm his guess work by inspecting master tapes of the album "Blizzard of Oz" which contains the song "Suicide Solution." After conducting tests on the master tapes, Mr. Hall did not find any subliminal messages in the song "Suicide Solution." In his report prepared for plaintiffs' attorney, Mr. Hall stated that the alleged subliminal lyrics are actually lyrics that are "preconscious, in that the vocal performance [of the lyrics in question] is audible (and is, therefore, not subliminal per se) but not immediately intelligible." Hall Dep. exh. 18, p. 2. The method of testing that plaintiffs in this case had assured the court on numerous occasions was the only means of confirming the existence of a subliminal message in the song "Suicide Solution" determined with certainty that no subliminal messages existed anywhere on the entire tape.

Plaintiffs' other expert, Victoria Evans, a computer science lecturer who has no experience in music recording or sound engineering, attempted to identify subliminal messages in the song "Suicide Solution" through the use of a MacIntosh computer and a software package called DigiDesign AudioMedia. Evans Dep., pp. 20, 47–49. While Ms. Evans credits the computer system with enabling her to discover what she has labelled a subliminal message in the song "Suicide Solution," the MacIntosh computer and the AudioMedia program did not, and could not, identify any of the words in the song; nor could it indicate any distinction between the lyrics and music contained on the record album. Evans Dep., pp. 51–52. The computer system assisted Ms. Evans by allowing her to copy the music onto a "sound file" and then slow it down so she could carefully listen to the lyrics. The only manner, however, in which Ms. Evans actually identified what she has labeled a subliminal message in the song "Suicide Solution" was by literally hearing the words with her own ears. Evans Dep., p. 52. Those words Ms. Evans heard on "Suicide Solution," which she labelled as a subliminal message, are an almost identical listing of the words that plaintiffs initially identified as, and Mr. Hall currently claims are, audible lyrics.[7] Evans Dep. exh. 5.

---

**6.** The lyrics contained in the "clearly audible but mostly unintelligible" preconscious suggestion Mr. Hall identified in his 1986 testing of "Suicide Solution" turn out to be precisely the same lyrics that plaintiffs in the instant case found to be audible and perceptible in their initial complaint and then to be a subliminal message according to their amended complaint. *See* footnote 1 of this order for the text of those lyrics.

**7.** The alleged subliminal message that Ms. Evans claims she heard is as follows:

Alright now, people ... (people is echoed)

Ms. Evans' findings indicate that she also has determined that the lyrics, which plaintiffs assert represent a subliminal message that incited their son to commit suicide, are words that are audible though not immediately intelligible. Evans Dep., p. 55. However, unlike plaintiffs' other expert, Mr. Hall, who failed to find a subliminal message because he realized that if the words are audible they cannot be subliminal, Ms. Evans found what she had labelled a subliminal message for the plaintiffs by failing to recognize the true meaning of subliminal and instead defining it for her purposes as any words contained in music that are barely heard but not decipherable. Evans Dep., 59.

Other than the expert witnesses Hall and Evans, plaintiffs produced two other affidavits in support of their case. The affidavits, however, fail to add any additional information not already provided by plaintiffs' other experts and merely indicate that they found lyrics in the song "Suicide Solution" unintelligible. Soon after those affidavits were taken, discovery in the case was closed and defendants filed the instant joint motion for summary judgment now before the court.

## II. DISCUSSION

Rule 56(c) of the Federal Rules of Civil Procedure allows for the granting of summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Upon motion and after adequate time for discovery, Rule 56(c) mandates the entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party

will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). A movant may discharge his burden by showing "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 326, 106 S.Ct. at 2554.

In evaluating a summary judgment motion, the evidence and all factual inferences must be viewed in the light most favorable to the nonmovant. *Thrasher v. State Farm Fire & Casualty Co.,* 734 F.2d 637, 638 (11th Cir.1984). "If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant the summary judgment motion." *Samples on Behalf of Samples v. City of Atlanta,* 846 F.2d 1328, 1330 (11th Cir.1988).

■ In determining whether or not the court should grant the joint summary judgment motion of the defendants in this case, the court must initially resolve the issue of whether, as a matter of law, the song "Suicide Solution" on the album "Blizzard of Oz" contains subliminal messages as alleged by plaintiffs. The court finds this step necessary because it is convinced that the presence of a subliminal message, whose surreptitious nature makes it more akin to false and misleading commercial speech and other forms of speech extremely limited in their social value, would relegate the music containing such to a class worthy of little, if any, first amendment constitutional protection.[8]

■ Plaintiffs attempt to establish the presence of subliminal messages in the song "Suicide Solution" contained on the "Blizzard of Oz" album primarily through the deposition testimony of two expert witnesses. Plaintiffs' expert, Mr Hall, how-

You really know what it's about,
You've got it.
Why try, why try ...
Take the gun, 'n try it, try it ...
Shoot! shoot! shoot! shoot!
Shooo.., sshooo, sshooo, sshooooo,
  (... Laughter ...)

Sshoo, sshoo, sshooo ... (sshooo sound repeats) Go'awn.
Evans Dep. exh. 5.

**8.** *See Vance v. Judas Priest,* No. 86–5844/86–3939, 1990 WL 130920 (2d Judicial District Court of the State of Nevada, Aug. 24, 1990), for an in depth discussion of subliminal messages.

ever, fails to create an issue of fact concerning the existence of a subliminal message when his specific finding is that since the lyrics in question in this case are audible, they cannot be a subliminal message as plaintiffs allege. Hall Dep. exh. 18, p.2.

■ Plaintiffs' other expert, Ms. Evans, is equally unsuccessful in creating a genuine issue of fact since she contends that the lyrics in question are a subliminal message precisely because they are barely heard but not decipherable. Evans Dep., 59. While the court was unable to find a precise legal definition of a subliminal message, it is clear from the definition of subliminal that lyrics which are audible enough to make one consciously aware of their presence, though they may not necessarily be intelligible, do not qualify as a subliminal message.

According to *Webster's Ninth New Collegiate Dictionary*, (1985 Edition), subliminal is actually defined as "inadequate to produce a sensation or perception" and "existing or functioning below the threshold of conscious awareness." *Random House Dictionary* (1987 Edition) defines subliminal as "existing or operating below the threshold of consciousness; being or employing stimuli insufficiently intense to produce a discrete sensation but often being or designed to be intense enough to influence the mental processes or the behavior of the individual." If, as defined, a subliminal message must exist below the threshold of conscious awareness then it must follow that lyrics distinct enough to be heard and reacted to—even though garbled or unclear, are not a subliminal message. The most important character of a subliminal message is that it sneaks into the brain while the listener is completely unaware that he has heard anything at all.[9] If the message is heard to any extent, even if garbled and unintelligible, the listener consciously attempts to discern a meaning from that which he hears. One is then dealing, not with a subliminal message, but rather the interpretation of an abstract medium which is akin to spotting objects in cloud formations.

Possibly a visual subliminal message such as the words "eat popcorn" on a reel of movie film can be proved more easily than an audio one such as the one alleged here. If the film is stopped and one holds each frame up to the light somewhere there must be at least one frame that says "eat popcorn." Here, there is nothing that says what the plaintiffs contend unless one uses his imagination. Therefore, despite her desire to label the lyrics contained in the twenty eight second interlude on the song "Suicide Solution" a subliminal message, the fact that Ms. Evans found that those lyrics are audible means that she has proved just the opposite—that the lyrics are not a subliminal message.

Furthermore, honoring Ms. Evans definition of subliminal message would mean that all rock music, or any music for that matter, which contains unintelligible lyrics could be found to contain a subliminal message, thereby, subjecting an endless number of performers and producers to possible law suits. It would be an understatement to say such a ruling would open the flood gates of litigation.

■ Ms. Evans' expert opinion that the song "Suicide Solution" contains a subliminal message directly contradicts the opinion rendered by plaintiffs' other expert, Mr. Hall. Moreover, in light of the definition of subliminal and the manner in which she defines subliminal message, it is clear that her opinion lacks any credible support and as such fails to create a genuine issue of fact concerning whether the song "Suicide Solution" on the album "Blizzard of Oz" contains subliminal messages. *See American Key Corp. v. Cole National Corp.*, 762 F.2d 1569, 1580 (11th Cir.1985) ("An ex-

---

**9.** In the book *Subliminal Seduction,* submitted by the plaintiffs, the author notes: Anything consciously perceived can be evaluated, criticized, discussed, argued, and possibly rejected, whereas unconsciously perceived information meets no resistance or qualification by the intel- lect. Subliminal data are merely stored in the brain with identifications ... which will trigger a delayed, alarm-clock reaction capable of motivating behavior. W. Key, *Subliminal Seduction,* p. 135 (1973).

pert's opinion that lacks any credible support does not create an issue of fact.").

Plaintiffs have steadfastly predicted that given the opportunity to thoroughly examine the song "Suicide Solution" they would be able to prove the existence of a subliminal message in the song. After their experts were given an unrestricted opportunity to find a subliminal message in the music in question, however, plaintiffs have been unable to produce any evidence which creates a genuine issue of fact concerning whether the song "Suicide Solution" on the album "Blizzard of Oz" contains a subliminal message. Plaintiffs have simply failed to produce any evidence from which one could even infer that there is a subliminal message in the song "Suicide Solution" on the album "Blizzard of Oz."

■ The court noted in its order denying defendants' motion to dismiss that the plaintiffs would be hard-pressed to avoid summary judgment in this action absent the presence of a subliminal message in the music of the defendants. Such is the case because music [10] in the form of entertainment represents a type of speech that is generally afforded first amendment constitutional protection. *Schad v. Borough of Mount Ephraim,* 452 U.S. 61, 65, 101 S.Ct. 2176, 2181, 68 L.Ed.2d 671 (1981). A constitutional protection that shields all who write, perform, or disseminate the music irrespective of whether it constitutes aberrant, unpopular, and even revolutionary music. *See High Ol' Times, Inc. v. Busbee,* 456 F.Supp. 1035, 1041 (N.D.Ga.1978) (citing *NAACP v. Button,* 371 U.S. 415, 444–45, 83 S.Ct. 328, 343–44, 9 L.Ed.2d 405 (1963); *Terminiello v. Chicago,* 337 U.S. 1, 4, 69 S.Ct. 894, 895, 93 L.Ed. 1131 (1949)).

■ The first amendment protection that shields those who produce, perform, and

distribute music is not however absolute. *See Konigsberg v. State Bar of California,* 366 U.S. 36, 49, 81 S.Ct. 997, 1005, 6 L.Ed.2d 105, *reh. denied,* 368 U.S. 869, 82 S.Ct. 21, 7 L.Ed.2d 69 (1961). Music legally classified as obscene [11] or defamatory [12], or that which represents fighting words [13] or incites imminent lawless activity [14] is either entitled to diminished first amendment constitutional protection or none at all. Therefore, even though the court has found that defendants' music does not contain subliminal messages, plaintiffs can strip away the first amendment protection defendants now stand behind if they can demonstrate that defendants music fits into one of the above categories.

■ Plaintiffs contend that the song "Suicide Solution" on the album "Blizzard of Oz" is properly categorized as speech which incites imminent lawless activity thereby depriving defendants of any legitimate claim to first amendment protection. The removal of first amendment protection from defendants' music on such a basis is contingent on a finding that it was "directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg,* 395 U.S. at 447, 89 S.Ct. at 1829. Subsequent Supreme Court decisions have further indicated that in making such a finding the primary focus of the court should be on the imminence of the threat. *Hess v. Indiana,* 414 U.S. 105, 94 S.Ct. 326, 38 L.Ed.2d 303 (1973).

In *Hess,* the Court was forced to decide whether an antiwar demonstrator's first amendment rights were violated when the state of Indiana arrested him for shouting, "We'll take the fucking street later [or again]," to a crowd the police were attempting to disperse. In upholding the demonstrator's first amendment right to

---

**10.** The term "music" refers to musical notes, rhythms, tones, and lyrics.

**11.** *See Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973); *Roth v. United States,* 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957).

**12.** *See Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); *Bose Corp.*

*v. Consumers Union of U.S., Inc.,* 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984).

**13.** *See Chaplinsky v. New Hampshire,* 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942).

**14.** *See Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969).

make that statement the court concluded that;

Since the uncontroverted evidence showed that Hess' statement was not directed to any person or group of persons, it cannot be said that he was advocating, in the normal sense, any action. And since there was no evidence or rational inference from the import of the language, that his words were intended to produce, and likely to produce, *imminent* disorder, those words could not be punished by the state on the ground that they had 'a tendency to lead to violence.'

*Id.* at 108–09, 94 S.Ct. at 328 (citations omitted; emphasis in original).

■ A careful examination of the defendants' music in accordance with the test developed in *Brandenburg* and refined in *Hess* leads this court to conclude that the defendants did not engage in culpable incitement. There is no indication whatsoever that defendants' music was directed toward any particular person or group of persons. Moreover, there is no evidence that defendants' music was intended to produce acts of suicide, and likely to cause *imminent* acts of suicide;[15] nor could one rationally infer such a meaning from the lyrics.

Viewing the facts in a light most favorable to the plaintiffs, the song "Suicide Solution" can be perceived as asserting in a philosophical sense that suicide may be a viable option one should consider in certain circumstances. And a strong argument can certainly be made that in light of the almost epidemic proportion of teenage suicides now occurring in this country it is irresponsible and callous for a musician with a large teenage following such as Ozzy Osbourne to portray suicide in any manner other than a tragic occurrence. Nevertheless, an abstract discussion of the moral propriety or even moral necessity for a resort to suicide, is not the same as indicating to someone that he should commit suicide and encouraging him to take such action. *See Noto v. United States*, 367 U.S. 290, 297–98, 81 S.Ct. 1517, 1521, 6

L.Ed.2d 836 (1961). That, however, is what the law requires the plaintiffs to demonstrate in order to hold the defendants liable for inciting their son to commit suicide through the dissemination of their music. *See Brandenburg*, 395 U.S. at 448, 89 S.Ct. at 1830. Plaintiffs have made no such showing and have failed to demonstrate any manner in which defendants' music can be categorized as speech which incites imminent lawless activity. Accordingly, the court finds as a matter of law that defendants are protected by the first amendment from liability for culpable incitement.

Absent the allegation that defendants' music represents speech that incites imminent lawless activities, plaintiffs have no other plausible basis in this case upon which they can overcome the broad first amendment protection generally afforded speech in the form of music. Plaintiffs put forth other theories of liability such as negligence, nuisance, fraud, and invasion of privacy. However, all of those tort based theories, as asserted by plaintiffs, fail to overcome the defendants' imposition of a valid first amendment defense.

Numerous courts have pointed out that any attempt to impose tort liability on persons engaged in the dissemination of protected speech involves too great a risk of seriously chilling all free speech. In *Walt Disney Productions, Inc. v. Shannon*, 247 Ga. 402, 276 S.E.2d 580 (1981), the court found that the imposition of tort liability on defendants who were charged with broadcasting statements which invited children to engage in conduct that posed a foreseeable risk of injury would open a Pandora's box and chill the flow of protected speech. The Fifth Circuit Court of Appeals indicated in *Herceg v. Hustler Magazine, Inc.*, 814 F.2d 1017, 1024 (5th Cir.1987), *cert. denied*, 485 U.S. 959, 108 S.Ct. 1219, 99 L.Ed.2d 420 (1988), that placing tort liability on some forms of protected speech would require the hopelessly complicated endeavor of differentiating between different categories of protected speech raising the possibility that "the worthiness of

---

**15.** There, in fact, is no evidence nor even any allegations in this case that Michael Jeffery Waller committed suicide immediately after listening to defendants' music.

speech might be judged by majoritarian notions of political and social propriety and morality."

In the case of *Zamora v. Columbia Broadcasting System*, 480 F.Supp. 199 (S.D.Fla.1979), plaintiffs urged the court to impose tort liability on the defendants for their negligent broadcast of violent shows which allegedly caused a susceptible minor to engage in unlawful conduct. In noting that the broadcasts represented speech which did not incite nor in any other way qualify for less than full constitutional protection, the court determined that plaintiffs were in essence asking the court to fashion a new cause of action for the dissemination of protected speech which caused "an untoward reaction on the part of any 'susceptible' person." *Id.* at 206. The court in *Zamora* declined to take such a step asserting that it would be an unconstitutional imposition of a generally undefined and undefinable duty. *Id.*

Plaintiffs do cite the case of *Weirum v. RKO General, Inc.*, 15 Cal.3d 40, 123 Cal. Rptr. 468, 539 P.2d 36 (1975), in which a wrongful death action was brought against a radio station for broadcasting promotional announcements encouraging listeners to race to a certain site, as supporting its argument that tort liability can and should be imposed in this action. The *Weirum* decision is distinguishable from the instant case, however, because the California Supreme Court never made a finding in the case that it was dealing with protected speech entitled to full first amendment protection.

■ In the final analysis, the court simply has no basis upon which to impose tort liability on the defendants when, as in this case, the alleged wrongful acts are based on the defendants' dissemination of protected speech. The court, therefore, finds as a matter of law that the defendants' first amendment rights protect them from being held liable under plaintiffs' claims of negligence, nuisance, fraud, and invasion of privacy.

## III. CONCLUSION

In all candor the court must also observe that the lyrics of a great many songs that come under the heading of rock music seem to foster an outlook on life that emphasizes alienation, cynicism, rebellion, and futility.[16] In a world full of traps for the unwary teenager such as rampant drug and alcohol abuse and a "new morality" that stresses the importance of doing anything that feels good, an addiction to music of this sort could be another step in a path to self destruction. Nevertheless, whether the defendants' album "Blizzard of Oz" could fit this description, or whether the court approves of rock music in general or of this particular brand of it, is irrelevant. The sole duty of this court in this lawsuit is to determine whether subliminal messages appear in the song and whether the music in question is afforded first amendment protection.

Plaintiffs' case is predicated almost entirely upon the allegation that defendants incited their son to commit suicide by the use of a subliminal message in the song "Suicide Solution" on the album "Blizzard of Oz." They asserted with confidence that a subliminal message did exist and if given the opportunity to test the master tapes of the song they could identify it. However, after being given every opportunity to find the subliminal message, using tests they stated were the only ways to confirm its existence, plaintiffs failed to present any evidence from which a reasonable fact finder could even infer that a subliminal message existed within the song "Suicide Solution" on the album "Blizzard of Oz."

Plaintiffs failed to demonstrate the existence of a subliminal message or that defendants' music incites imminent lawless activity, and were thereby left with the difficult task of attempting to impose liability on the defendants based on their dissemina-

---

**16.** On the other hand one man's meat is another man's poison (or woman's as the case may be). Many young people find just as much relaxation and pleasure from rock music without the dreary lyrics of Suicide Solution as the rest of us get from the music of Beethoven, Gamble Rogers, Whitney Houston, or Hank Williams— as the case may be.

tion of speech fully protected by the first amendment. It was a task plaintiffs were unable to accomplish.

Having ruled on the matter before the court, this order cannot be signed without an expression of sympathy for the parents of Michael Jeffery Waller who have shown their devotion to his memory by the filing and prosecution of this lawsuit. The court has no doubt as to the sincerity of their motives in following through with what must be an extremely painful course of action. The death of anyone before he has had a full measure of life is tragic and especially so if the person is a much loved teenaged son. If the death is by suicide the pain and grief to those left behind is almost unbearable. Although the court must render all its decisions without regard to sympathy, that does not mean it loses its capacity to experience that emotion.

Accordingly, for the foregoing reasons, defendants' Joint Motion for Summary Judgment is GRANTED as the court finds that there are no genuine issues of material fact concerning the claims put forth by plaintiffs in this action and defendants are entitled to judgment as a matter of law.

SO ORDERED.