MEMORANDUM OPINION
 

 H. FRANKLIN WATERS, Chief Judge.
 

 These consolidated cases are currently before the court on the defendants’ motion to dismiss and the plaintiffs response thereto. These putative class action cases
 
 [1]
 
 were filed by Janet Gilmer on behalf of herself and all other similarly situated individuals throughout the United States who have purchased certain home videos, namely “The Lion King,” “The Fox and the Hound,” and “Little Mermaid.”
 

 The plaintiff claims that the video cassettes or the plastic video cassette ease of these three Disney films
 
 [2]
 
 contain drawings and animated scenes depicting sexual messages or other sexually related material unsuitable for young children and/or family viewing.
 

 Specifically, plaintiff alleges that the front cover of the plastic case in which “The Little Mermaid” was distributed in 1989 & 1990 contains a depiction of an erect penis on one of the spires of the castle drawn between the two main characters. With respect to “The Fox and the Hound” distributed in 1994, plaintiff contends that one scene contains a subliminal message consisting of the widow in the film “giving the finger” to the camera after picking up Tod, the fox. With respect
 
 *667
 
 to “The Lion King” distributed in 1995, plaintiff alleges it contains a subliminal scene where a cloud of milk-weed particles form the word “Sex” in the sky above one of the main characters in the movie.
 

 The amended complaint filed on April 24, 1996, asserts the following causes of action: (1) invasion of privacy; (2) common law fraud; (3) breach of warranties both express and implied; and (4) negligence. Defendants, Buena Vista Home Video, Inc. (BVHV), and Walt Disney Pictures and Television (WDP), have now moved for dismissal of the complaint on a number of grounds. First, defendants have moved pursuant to Rule 12(b)(6) for dismissal of each cause of action. Fed.R.Civ.P. 12(b)(6). Second, defendants move pursuant to Rule 9 for dismissal of the fraud claim. Fed.R.Civ.P. 9. Finally, WDP moves for dismissal of all claims against it on the grounds that personal jurisdiction over it is lacking. Fed. R. Civ.P. 12(b)(2). We will address each argument in turn.
 

 Failure to State a Claim, Rule 12(b)(6).
 

 A Rule 12(b)(6) motion is to be read as a whole,
 
 Continental Ore Co. v. Union Carbide and Carbon Corp.,
 
 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962), and it is to be denied unless “it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.”
 
 Conley v. Gibson,
 
 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957);
 
 Bennett v. Berg,
 
 710 F.2d 1361 (8th Cir.1983).
 

 In addition, complaints are to be “liberally construed in favor of the plaintiff.”
 
 See Jenkins v. McKeithen,
 
 395 U.S. 411, 421, 89 S. Ct. 1843, 1849, 23 L.Ed.2d 404 (1969), and
 
 United States v. Advance Machine Co.,
 
 547 F.Supp. 1085, 1088 (D.Minn.1982). It has also been said that all facts pleaded in the complaint are taken to be true for 12(b)(6) purposes,
 
 Hospital Building Co. v. Trustees of Rex Hospital,
 
 425 U.S. 738, 740, 96 S.Ct. 1848, 1850, 48 L.Ed.2d 338 (1976), and all reasonable inferences from facts pleaded in the complaint are to be drawn and deemed to be true.
 
 See generally 5A
 
 Charles A. Wright & Arthur R. Miller,
 
 Federal Practice and Procedure
 
 § 1357 (2d ed. 1990).
 

 Rule 12(b) provides that
 

 [i]f, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.
 

 Fed.R.Civ.P. 12(b).
 

 Plaintiff has submitted, under seal, in connection with her response in excess of 2000 exhibits. The majority of these exhibits consist of letters written to BVHV regarding the three videos at issue and BVHVs responses to those letters. Plaintiff has offered these exhibits to show that the images at issue have been characterized as “subliminal.” Plaintiff has also submitted under seal copies of defendants’ responses to interrogatories, requests for production of documents, and requests for admissions. Finally, plaintiff has submitted the video cassette of “The Lion King,” a video cassette of “The Fox and the Hound,” and a still picture from a scene in the latter film which plaintiff states is not visible to the ordinary viewer at regular speed. If it becomes necessary for the court to consider these exhibits, this portion of the motion will be converted to a summary judgment motion and the parties given the opportunity to supplement the materials currently before the court.
 

 1. The First Amendment/Invasion of Privacy.
 

 Defendants first contend that the images about which the plaintiff complains are protected free speech and that no cause of action for invasion of privacy, or in fact any tort cause of action, can be based on protected speech. Defendants state that the plaintiff cannot avoid the constitutional hurdle presented by the First Amendment merely by labeling the images/messages she disapproves of as subliminal messages not protected by the First Amendment. Moreover, defendants contend that given how motion pictures are made, under plaintiffs theory,
 
 *668
 
 every frame of film contains a subliminal message simply because no single frame is ever viewed individually and in isolation.
 

 Furthermore, defendants state the plaintiff has conceded that two of the three images at issue' are plainly visible by ordinary viewing means and therefore are not subliminal and even under plaintiffs view of the law are therefore entitled to the full protection of the First Amendment. Finally defendants argue that even if the images are deemed to be subliminal, they are nonetheless protected free speech.
 

 Defendants point out that the image on the outside of the “The Little Mermaid” cannot possibly be subliminal as it is in plain sight, in static form, on the outside of the package.' Additionally, defendants remind the court that in earlier complaints the plaintiff has alleged that most viewers of “The Lion King” video can see the objectionable message even at regular speed. With respect to the objectionable image in “The Fox and the Hound,” defendants point out that plaintiff merely refers to the image as a subliminal image without alleging whether it can be viewed through ordinary viewing means or whether it only can be seen by a special technical procedure, such as a slow motion frame-by-frame advance.
 

 Moreover, defendants contend the complaint is devoid of any allegation or suggestion that the alleged subliminal messages were intended to, or did in fact, affect anyone’s conduct or behavior in any way. According to defendants, these pleading defects are fatal to plaintiffs invasion of privacy claim and in fact to all of the plaintiffs claims. In defendants’ view each separate cause of action asserted is merely an example of artful pleading of four versions of plaintiffs objection to protected speech.
 

 Plaintiff states that the defendants efforts to seek protection under the First Amendment will fail for the following reasons: (1) no court has ever found that subliminal messages are entitled to any protection under the First Amendment, and two courts have held that such messages are
 
 not
 
 protected; (2) to the extent plaintiff seeks to impose liability on defendants for fraud, the First Amendment has never been interpreted to protect fraudulent speech; (3) the commercial speech at issue here may be subjected to reasonable government regulation and tort liability; (4) no court has ever applied the First Amendment as a defense in a breach of warranty case; (5) recent decisions of the Supreme Court make clear that government regulation designed to protect children from exposure to indecent material does not offend the First Amendment; and (6) the Supreme Court has consistently given less First Amendment protection to speech which affects a captive audience, particularly when the speech invades the privacy of one’s home.
 

 Plaintiff also reminds the court that the amended class action complaint is the operative pleading to be considered in ruling on defendants’ Rule 12(b)(6) motion and that regardless of defendants’ characterization of the offensive images the complaint describes the materials as subliminal. Plaintiff contends the exhibits reveal that consumers from all across the United States have used the term “subliminal” to describe the offensive materials. Further, plaintiff indicates many of the consumers describe the circumstances under which the offensive material was detected which shows in plaintiff’s opinion that she has correctly characterized the materials as subliminal.
 

 Plaintiff contends there are actually two types of “speech” involved in this case. First, there is the content of the videos themselves and the cover art of the video cassette package for “The Little Mermaid.” Plaintiff concedes this type of speech is not commercial in nature. Second, there are the written and verbal misrepresentations that the home videos are suitable for the targeted audiences. This type of speech plaintiff contends is clearly commercial in nature and not protected as it is inherently misleading.
 
 Central Hudson Gas & Electric Corp. v. Public Service Commission,
 
 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). With respect to her fraud and breach of warranty claims, plaintiff states she does not challenge defendants’ right to include offensive materials in home videos. Rather, plaintiff states she seeks to impose liability on defendants for misleading consumers.
 

 
 *669
 
 If the offensive materials themselves are not subliminal, a fact plaintiff does not concede, plaintiff admits that the invasion of privacy and negligence claims present a difficult question. It is plaintiffs opinion that the proper First Amendment analysis is that contained in the Supreme Court decisions that involve the dissemination of indecent, as opposed to obscene, materials to teenagers and young children. She suggests that, properly phrased, the issue is whether a state can impose tort liability on a defendant for disseminating indecent material to teenagers and young children through home videos that are intended to be viewed in the privacy of a personal residence.
 

 It has long been held that motion pictures are “a significant medium for the communication of ideas” and are “a form of expression whose liberty is safeguarded by the First Amendment.”
 
 Joseph Burstyn, Inc. v. Wilson, 3
 
 43 U.S. 495, 501, 72 S.Ct. 777, 780, 96 L.Ed. 1098 (1952). This protected status is not altered because the medium is designed to entertain as well as inform or because “their production, distribution, and exhibition is a large-scale business conducted for private profit.”
 
 Id.,
 
 343 U.S. at 501, 72 S.Ct. at 780.
 

 However, the guarantees of the First Amendment are not absolute. Thus, as the Supreme Court has noted:
 

 To hold that liberty of expression by means of motion pictures is guaranteed by the First and Fourteenth Amendments ... is not the end of our problem. It does not follow that the Constitution requires absolute freedom to exhibit every motion picture of every kind at all times and all places.
 

 Id.,
 
 343 U.S. at 502, 72 S.Ct. at 781.
 

 Further, the Supreme Court has identified certain categories of speech or communicative conduct which are not protected under the First Amendment. “These include the lewd and obscene, the profane, the libelous, and the insulting or ‘fighting’ words those which by their very utterance inflict injury or tend to incite an immediate breach of the peace. It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.”
 
 Chaplinsky v. New Hampshire,
 
 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942).
 

 If the speech at issue is protected, courts have been reluctant to impose tort liability on persons engaged in dissemination of such speech.
 
 New York Times v. Sullivan,
 
 376 U.S. 254, 283, 84 S.Ct. 710, 727-28, 11 L.Ed.2d 686 (1964) (a state cannot impose tort damages for speech protected by the Constitution). The risk is that the imposition of tort liability would impermissibly chill the exercise of First Amendment rights.
 

 The courts that have addressed the issue tend to afford subliminal images less First Amendment protection than perceptible images. For instance in
 
 Vance v. Judas Priest,
 
 No. 86-5844/86-3939, 1990 WL 130920 (D.C.Nev. August 24, 1990) the court was faced with the issue of whether verbal or audio subliminal messages contained in a record album were protected under the First Amendment. The court ruled that subliminal messages are not “speech” within the meaning of the First Amendment. The court found that: (1) subliminal messages do not advance free speech goals; (2) people have a First Amendment right to be free from unwanted speech; and (3) the listener’s right to privacy is greater than the purveyor’s interest in using subliminal messages.
 

 In connection with the invasion of privacy claim, the
 
 Vance court
 
 held that, for a subliminal message to invade one’s privacy, the message must manipulate or affect, or be intended to manipulate or affect, the behavior of the recipient of the message.
 

 In the case of
 
 Waller v. Osbourne,
 
 763 F.Supp. 1144 (M.D.Ga.1991),
 
 affd without op.,
 
 958 F.2d 1084 (11th Cir.1992),
 
 cert. denied,
 
 506 U.S. 916, 113 S.Ct. 325, 121 L.Ed.2d 245 (1992), the plaintiffs brought a wrongful death action asserting that their son had been incited to “commit suicide through the music, lyrics, and subliminal messages contained the song ‘Suicide Solution’ on the album ‘Blizzard of Oz.’” In
 
 *670
 
 deciding motions for summary judgment, the court noted it must
 

 initially resolve the issue of whether, as a matter of law, the song “Suicide Solution” on the album “Blizzard of Oz” contains subliminal messages as alleged by plaintiffs. The court finds this step necessary because it is convinced that the presence of a subliminal message, whose surreptitious nature makes it more akin to false and misleading commercial speech and other forms of speech extremely limited in their social value, would relegate the music containing such to a class worthy of little, if any, first amendment constitutional protection.
 

 Id.
 
 at 1148.
 

 Finding no legal definition of the term subliminal, the
 
 Waller
 
 court resorted to dictionary definitions noting that subliminal is defined as “inadequate to produce a sensation or perception” and “existing or functioning below the threshold of conscious awareness.”
 
 Id.
 
 at 1149 (citation omitted). In this case, the plaintiff in the amended complaint states that “[sjubliminal communication is generally defined as the projection of messages by light or sound so quickly or faintly that they are received by the listener or viewer below the level of conscious awareness.”
 

 The
 
 Waller
 
 court concluded that
 

 [i]f, as defined, a subliminal message must exist below the threshold of conscious awareness then it must follow that lyrics distinct enough to be heard and reacted to- — even though garbled or unclear, are not a subliminal message. The most important character of a subliminal message is that it sneaks into the brain while the listener is completely unaware that he has heard anything at all. If the message is heard to any extent, even if garbled and unintelligible, the listener consciously attempts to discern a meaning from that which he hears. One is then dealing, not with a subliminal message, but rather the interpretation of an abstract medium which is akin to spotting objects in cloud formations.
 

 Id.
 
 The court held the plaintiff has failed to produce evidence from which one could even infer that there was a subliminal message in the song.
 
 Id.
 
 at 1150.
 

 The court then went on to discuss whether the song fell into any of the categories of speech that are given either diminished or no First Amendment constitutional protection.
 
 Id.
 
 The court found the music did not fall into any of the categories which reduce or eliminate the First Amendment protection. Therefore, the court held that none of the tort theories of liability advanced by plaintiffs, such as negligence, fraud, and invasion of privacy, were sufficient to withstand “the defendants’ imposition of a valid first amendment defense.”
 
 Id.
 
 at 1151. In sum, the court stated that “[i]n the final analysis, the court simply has no basis upon which to impose tort liability on the defendants when, as in this case, the alleged wrongful acts are based on the defendants’ dissemination of protected speech.”
 
 Id.
 
 at 1152.
 

 In each of the cases discussed, the court felt the proper characterization of the message as being subliminal or not was important to the court’s analysis of the First Amendment issue. We agree that the proper characterization of the “speech” at issue may well impact on our analysis of the First Amendment issues. Particularly important will be whether the speech or expression at issue is within the bounds of First Amendment protection. This type of characterization cannot be made on the basis of a Rule 12(b)(6) motion. The motion to dismiss on the basis of the First Amendment will be denied.
 

 2. Breach of Warranty.
 

 Plaintiff asserts breaches of express warranties and breaches of the implied warranties of merchantability and fitness for a particular purpose. Defendants do not separately address each type of warranty. Instead, defendants concentrate on the asserted breach of an implied warranty of merchantability.
 

 To recover for breach of an implied warranty of merchantability, the plaintiffs must prove: (1) that they sustained damages; (2) that the goods sold to them were not merchantable,
 
 i.e.,
 
 fit for the ordinary pur
 
 *671
 
 pose for which such goods are used; (3) that the unmerchantable condition was a proximate cause of the plaintiffs’ damages; and (4) that the plaintiffs were persons whom the defendants might reasonably expect to use or be affected by the goods.
 
 E.I. Du Pont de Nemours & Co. v. Dillaha,
 
 280 Ark. 477, 659 S.W.2d 756 (1983).
 
 See also
 
 Ark.Code Ann. § 4-2-314 (Repl.1991).
 

 In defendants’ view, plaintiffs breach of warranty claims boil down to the allegation that BVHV should be liable for promoting the videos as suitable for young children even though they allegedly contain subliminal sexual messages. In determining whether a breach of warranty exists, defendant contends the court must distinguish between the tangible properties of the goods sold and the thoughts or ideas conveyed thereby. They contend the implied warranty from a merchant who regularly sells video cassette is limited to the physical properties of such cassettes and does not extend to their content. BVHV relies,
 
 inter alia,
 
 on
 
 Winter v. G.P. Putnam’s Sons,
 
 938 F.2d 1033 (9th Cir. 1991) and
 
 Cardozo v. True,
 
 342 So.2d 1053 (Fla.Dist.Ct.App.1977),
 
 cert. denied,
 
 353 So.2d 674 (Fla.1977). Both cases hold that a book publisher warrants only the tangible, physical properties of a book and makes no warranty regarding the content of the book communicated by the book’s author or publisher.
 

 Plaintiff contends these cases are easily distinguished. Here, the video cassettes are sold as a package which consists of the tape itself and the cover. These items together, according to plaintiff, constitute goods within the meaning of the Uniform Commercial Code as adopted in Arkansas. In the cases cited by defendants, the plaintiff contends the courts refused to impose liability because there was nothing whatsoever wrong with the books
 
 ie.,
 
 the books said exactly what they were supposed to say. Thus, any cause of action which proceeded on a theory that the ideas conveyed in the books were harmful to the people was inappropriate.
 

 Here, plaintiff argues the “tangible properties” do not conform to the defendants’ warranties and the plaintiffs complaint is about the tangible properties of the product itself— not just the ideas conveyed by the offensive materials. As examples, plaintiff points to the cover of “The Little Mermaid” and the still photograph from “The Fox and the Hound.”
 

 We disagree with plaintiffs characterization. Plaintiff does not complain in any respect about the physical properties of the film or the covers as opposed to the ideas, thoughts, or images contained thereon. There is no allegation that the videos contained physical defects. Rather, plaintiffs complaint is that the videos and/or the covers contain offensive or morally unfit images or messages.
 

 However, plaintiff does allege that BVHV, in promoting and marketing the videos, warranted that they were suitable for viewing by children despite its knowledge at the time of marketing that the videos contained subliminal messages. These allegations are sufficient to withstand a motion to dismiss even under the eases relied on by defendants.
 
 See e.g., Cardozo v. True,
 
 342 So.2d 1053 (Fla. Dist.Ct.App.1977) (“[W]e hold that absent allegations that a book seller knew that there was reason to warn the public as to the contents of a book, the implied warranty in respect to sale of books by a merchant who regularly sells them is limited to a warranty of the physical properties of such books and does not extend to the material communicated by the book’s author or publisher.”). Whether plaintiff can withstand a properly supported summary judgment motion will be determined at a later point in time.
 

 3. Negligence.
 

 Count four of the amended complaint alleges that WDP was negligent in failing to exercise the requisite care in the production of the videos. As we find,
 
 infra,
 
 that we lack personal jurisdiction over WDP, we need not address this claim or the parties’ arguments in connection therewith.
 

 Particularity Requirement of Rule 9.
 

 As defined by the Arkansas Supreme Court, common law fraud has five elements: (1) a false representation, usually of a material fact; (2) knowledge or belief by the defendant that the representation is false
 
 *672
 
 or that it lacks a sufficient basis of information to make the statement, that is, the scienter requirement; (3) intent to induce the plaintiff to act or to refrain from acting in reliance upon the representation; (4) justifiable reliance by the plaintiff upon the representation; and (5) resulting damage to the plaintiff. Howard W. Brill,
 
 Arkansas Law of Damages
 
 § 35-7 (2d ed. 1990).
 
 See also McWilliams v. Zedlitz,
 
 294 Ark. 336, 338, 742 S.W.2d 929 (1988).
 

 Defendants argue the plaintiffs fraud allegations are woefully deficient under Rule 9(b) and require dismissal of the claim. According to defendants, plaintiffs fraud claim starts and ends with the conclusory allegation that defendants intentionally misrepresented material facts to plaintiff and other class members in connection with the production and distribution of the videos. Further, defendants state the complaint contains no facts specifying the person or persons involved in the alleged fraud instead merely alleging that the defendants or senior Disney executives were aware of the objectionable images.
 

 Rule 9(b) requires particularity in pleading the circumstances constituting fraud. Fed.R.Civ.P. 9(b). Although conclusory allegations that a defendant’s conduct was fraudulent and deceptive are not enough to satisfy Rule 9(b), it is sufficient for a claimant to set forth the time, place, and circumstances of the alleged fraudulent activities.
 
 Antinore v. Alexander & Alexander Services, Inc.,
 
 597 F.Supp. 1353 (D.Minn. 1984). The test of pleading under Rule 9(b) is whether the pleading gives fair notice of the claims asserted and the basic transactions upon which the claims are based.
 
 Burns v. Ersek,
 
 591 F.Supp. 837 (D.Minn. 1984).
 

 It is important to remember that “Rule 9 must be read in light of the basic pleading philosophy set forth in Rule 8____ This means that even those portions of Rule 9 that require specific or detailed allegations should not be construed strictly; it must be remembered that the federal rules contemplate a de-emphasis of the pleadings and a general simplicity in pleading practice.” 5 Charles A. Wright & Arthur R. Miller,
 
 Federal Practice and Procedure
 
 § 1291 (2d Ed.1990).
 

 We believe the plaintiff has met the pleading requirements of Rule 9. The motion is denied on this point.
 

 Lack of Personal Jurisdiction, Rule 12(b)(2).
 

 WDP contends that this court does not have specific or general jurisdiction over it. In support of its motion, WDP offers the affidavit of Anne L. Buettner, assistant treasurer of WDP.
 

 Ms. Buettner advises the court of the following facts: (1) WDP is a California corporation with its principal place of business in Burbank, California; (2) WDP is engaged in the business of theatrical and network television motion picture production; (3) WDP is not qualified to do, and does not conduct, business in Arkansas; (4) WDP has no agent for service of process in Arkansas, owns no real property here, and has no office, place of business, telephone listing, or bank account in Arkansas; (5) WDP does not distribute home videos, motion pictures, or promotional material to or in Arkansas; (6) WDP does not distribute animated motion pictures in any format, including the video format; and (7) WDP or its predecessor in interest produced but did not distribute the three Disney movies at issue.
 
 [3]
 

 In short, WDP argues it does nothing more than create motion picture entertainment which is purely intellectual property that can be licensed for distribution in various media. WDP emphasizes that it is BVHV that controls the distribution of the motion pictures not WDP.
 

 Plaintiff makes no argument that general jurisdiction exists. Rather, plaintiff relies on the stream of commerce theory and argues that, as the manufacturer of a product, WDP is subject to personal jurisdiction in Arkansas because it manufactured the product and
 
 *673
 
 then passed the product to a distributor for distribution throughout the United States. In support of her argument, plaintiff relies on
 
 Barone v. Rich Bros. Interstate Display Fireworks Co.,
 
 25 F.3d 610 (8th Cir.),
 
 cert. denied,
 
 — U.S. -, 115 S.Ct. 359, 130 L.Ed.2d 313 (1994) and
 
 Asahi Metal Indus., Co. v. Superior Court of Calif,
 
 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987).
 

 “[A] complaint should not be dismissed for want of jurisdiction, before trial, if there is any genuine issue as to any fact material to the jurisdictional question.”
 
 Radaszewski v. Telecom Corp.,
 
 981 F.2d 305, 309 (8th Cir. 1992),
 
 cert. denied,
 
 508 U.S. 908, 113 S.Ct. 2338, 124 L.Ed.2d 248 (1993). “While the facts adduced in a Rule 12(b)(2) Motion to Dismiss for lack of personal jurisdiction must be viewed in the light most favorable to the party opposing the motion, there must nonetheless be some evidence upon which a prima facie showing of jurisdiction may be found to exist, thereby casting the burden upon the moving party to demonstrate a lack of personal jurisdiction.”
 
 Aaron Ferer & Sons Co. v. Diversified Metals Corp.,
 
 564 F.2d 1211, 1215 (8th Cir.1977).
 
 See also Dakota Industries, Inc. v. Ever Best Ltd.,
 
 28 F.3d 910, 915 (8th Cir.1994) (The nonmoving party need only make a prima facie showing of jurisdiction).
 

 The Arkansas long-arm statute formerly provided certain listed bases for personal jurisdiction. Ark.Code' Ann. § 16-A-101 (Repl.1994). The long-arm statute has been amended and now provides that “[t]he courts of this state shall have personal jurisdiction of all persons, and all causes of action or claims for relief, to the maximum extent permitted by the due process of law clause of the Fourteenth Amendment of the United States Constitution.” Ark.Code Ann. § 16-4r-101(B) (Supp.1995).
 

 Even before this amendment, Arkansas’s long-arm statute had been interpreted to extend to the limits of federal due process.
 
 Kilcrease v. Butler,
 
 293 Ark. 454, 455, 739 S.W.2d 139 (1987) (citations omitted). Thus the sole question is whether the exercise of personal jurisdiction is consistent with the due process clause.
 
 Bell Paper Box, Inc. v. Trans Western Polymers, Inc.,
 
 53 F.3d 920, 921 (8th Cir.1995);
 
 Barone v. Rich Bros. Interstate Display Fireworks Co.,
 
 25 F.3d 610, 612 (8th Cir.1994),
 
 cert. denied,
 
 — U.S. -, 115 S.Ct. 359, 130 L.Ed.2d 313 (1994).
 

 “The test for due process is whether there are sufficient ‘minimum contacts’ between the nonresident defendant and the forum state so that the assertion of personal jurisdiction over the nonresident defendant is consistent with traditional notions of fair play and substantial justice.”
 
 Mountaire Feeds, Inc. v. Agro Impex, S.A,
 
 677 F.2d 651, 654 (8th Cir.1982),
 
 citing, World-Wide Volkswagen Corp. v. Woodson,
 
 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980);
 
 International Shoe Co. v. Washington,
 
 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).
 

 Sufficient contacts exist when the defendant’s conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there, and when maintenance of the suit does not offend traditional notions of fair play and substantial justice. In assessing the defendant’s “reasonable anticipation,” there must be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.
 

 Soo Line R.R. Co. v. Hawker Siddeley Canada, Inc.,
 
 950 F.2d 526, 528-29 (8th Cir.1991) (citations and internal quotation marks omitted).
 

 The Court of Appeals for the Eighth Circuit has determined that satisfaction of the due process standard may be measured by weighing the following factors: the nature and quality of defendant’s contacts with the forum state; quantity of contacts; source and connection of the cause of action with those contacts; and, to a lesser degree, the interest of the forum state in providing a forum for its residents; and the convenience of the parties.
 
 Aftanase v. Economy Baler Co.,
 
 343 F.2d 187 (8th Cir.1965).
 

 The focus of the inquiry is on the relationship “among the defendant, the forum, and the litigation.”
 
 Shaffer v. Heitner,
 
 433 U.S. 186, 204, 97 S.Ct. 2569, 2580, 53 L.Ed.2d 683 (1977). As the Supreme Court has stated on
 
 *674
 
 more than one occasion, the determination of whether minimum contacts exist “is one in which few answers will be written ‘in black and white. The greys are dominant and even among them the shades are innumerable.’”
 
 Kulko v. California Super. Ct.,
 
 436 U.S. 84, 92, 98 S.Ct. 1690, 1697, 56 L.Ed.2d 132 (1978)
 
 (quoting Estin v. Estin,
 
 334 U.S. 541, 545, 68 S.Ct. 1213, 92 L.Ed. 1561 (1948)).
 

 Following the Supreme Court’s decision in
 
 Helicopteros Nacionales de Colombia, S.A. v. Hall,
 
 466 U.S. 408, 414 nn. 8 & 9, 104 S.Ct. 1868, 1872 nn. 8 & 9, 80 L.Ed.2d 404 (1984) the Eighth Circuit “elaborated on the third factor (the relationship of the cause of action to the contacts), distinguishing between specific jurisdiction and general jurisdiction.”
 
 Bell Paper Box, Inc. v. U.S. Kids, Inc.,
 
 22 F.3d 816, 819 (8th Cir.1994) (citation omitted).
 

 “Specific jurisdiction refers to jurisdiction over causes of action arising from or related to a defendant’s actions within the forum state,” while “[gjeneral jurisdiction ... refers to the power of a state to adjudicate any cause of action involving a particular defendant, regardless of where the cause of action arose.”
 

 Id.
 
 at 819 (citations omitted).
 

 The stream of commerce theory of personal jurisdiction is merely a type of specific jurisdiction.
 
 Barone v. Rich Bros. Interstate Display Fireworks Co., 25
 
 F.3d 610, 612 (8th Cir.),
 
 cert. denied,
 
 — U.S.-, 115 S.Ct. 359, 130 L.Ed.2d 313 (1994). The theory provides an “analytical tool useful in cases in which the defendant’s contacts are the result of establishing a distribution network in the forum State for the sale of defendant’s products----”
 
 Viam Corp. v. Iowa Export-Import Trading Co.,
 
 84 F.3d 424, 427 (Fed.Cir. 1996).
 

 In the cases cited by and relied on by the plaintiffs there is far more evidence of the intentional establishment of a stream of commerce than is present in the case at hand. Here, plaintiffs in effect assert that, because WDP produces the motion pictures at issue which are distributed on a nationwide basis, it is subject to personal jurisdiction in each and every state. Plaintiff advances no facts to suggest that WDP played any part in the distribution or promotion of the film or in the decision making process regarding the manner or places of distribution. Nor does plaintiff advance any facts to dispute WDP’s assertion that it does not “manufacture” a product or the videos at issue. The court has not been given any detail regarding the arrangement between WDP and BVHV.
 

 The relationship created by the mere act of producing a film or motion picture is not sufficient to satisfy the requirements of due process. Neither the Eighth Circuit in
 
 Bar-one
 
 nor the Supreme Court in
 
 Asahi
 
 has given the stream of commerce theory the breadth suggested by plaintiff. The courts have not abandoned the notion that jurisdiction must be premised on activity deliberately directed toward the forum state or on proof of purposeful availment of the privilege of doing business in the forum state.
 
 See also Lesnick v. Hollingsworth & Vose Co.,
 
 35 F.3d 939 (4th Cir.1994),
 
 cert. denied,
 
 — U.S. -, 115 S.Ct. 1103, 130 L.Ed.2d 1070 (1995);
 
 Renner v. Lanard Toys, Ltd.,
 
 33 F.3d 277 (3d Cir.1994). In short, we conclude on the basis of the record before us that personal jurisdiction over WDP is lacking.
 

 Conclusion.
 

 For the reasons stated the defendants’ motion to dismiss will be granted in part and denied in part.
 

 [1]
 

 . The court also has pending plaintiff's motion for class certification.
 

 [2]
 

 . The court will use the term Disney films as a shorthand reference to the three films at issue. However, the court is not attributing the films to any specific Disney or Disney related enterprise.
 

 [3]
 

 . BVHV is a distributor of motion pictures on video cassettes, many of which appear under the trade name "Walt Disney Home Video.”