Ronny ZAMORA, a minor, by and through his father and next friend, Frank Zamora, Individually; and Yolanda Zamora, Individually, Plaintiffs,

v.

COLUMBIA BROADCASTING SYSTEM, a New York Corporation; American Broadcasting Company, a New York Corporation; and National Broadcasting Company, a Delaware Corporation, Defendants.

No. 78–1718–Civ.–WMH.

United States District Court,
S. D. Florida,
Miami Division.

Nov. 19, 1979.

Ellis S. Rubin, Nelson A. Faerber, Jr., Charles H. Sinclair, Miami, Fla., for plaintiffs.

William B. Killian, Timothy B. Dyk, Alan N. Braverman, Ronald E. Guttman, CBS, Inc., New York City, Steel, Hector & Davis, Miami, Fla., Wilmer, Cutler & Pickering, Washington, D. C., for defendant Columbia Broadcasting System.

William Snow Frates and James B. Tilghman, Jr., Frates, Floyd, Pearson, Stewart, Richman & Greer, P. A., Miami, Fla., for defendant American Broadcasting Co.

Daniel P. S. Paul, Paul & Thomson, Miami, Fla., Floyd Abrams, Cahill Gordon & Reindel, New York City, for defendant National Broadcasting Co., Inc.

## MEMORANDUM OPINION AND FINAL JUDGMENT

HOEVELER, District Judge.

Ronny Zamora, a minor, together with his father and mother sued the National Broadcasting Company, Columbia Broadcasting System and American Broadcasting Company for damages. Diversity and requisite amount are asserted as the bases for jurisdiction. In brief, the plaintiffs alleged that Ronny Zamora, from the age of five years (he was age 15 when this action was filed) has become involuntarily addicted to and "completely subliminally intoxicated" by the extensive viewing of television violence offered by the three defendants. The defendants are charged with breaching their duty to plaintiffs by failing to use ordinary care to prevent Ronny Zamora from being "impermissibly stimulated, incited and instigated" to duplicate the atrocities he viewed on television. The minor plaintiff, it is further charged, developed a sociopathic personality, became desensitized to violent behavior and became a danger to himself and others.

On June 4, 1977, in Miami Beach, Florida, Ronny Zamora shot and killed his 83 year old neighbor, Elinor Haggart. The complaint does not allege the circumstances under which the shooting took place. We must conclude from the complaint (as was a well-publicized fact) that young Zamara was convicted of charges growing out of the killing. The complaint further alleges that he has been deprived of his liberty and imprisoned; has become a sociopathic personality and cannot lead a normal life. The complaint also alleges that both parents have sustained certain losses for which they make claim. There is no allegation that any particular program incited young Zamora to the action in question or that his viewing of one network was more or less frequent than his viewing of others. Neither is there any allegation as to when in the ten-year span referred to the suggested duty (and consequent failure to respond) applied to any one or all of the defendants, nor whether the minor plaintiff's conduct

was the product of pre-duty exposure or post-duty influence.

The defendants moved to dismiss the complaint contending variously that to permit the claims as stated would abridge their first amendment rights; that no duty of the type alleged exists by statute or otherwise and that in any event, the complaint wholly fails to set forth a legal or factual basis to support the charge of proximate cause. The Court agrees with these positions. The complaint was dismissed by separate order giving the plaintiffs leave to amend. The plaintiffs have elected not to amend. By the terms of the Court's prior order, this order becomes the final judgment of the Court.

## I. HAS A CAUSE OF ACTION BEEN STATED?

■ The parties agree that the determination of whether the allegations in the complaint set forth a claim cognizable by the Courts, is essentially one of law. Due to the novel basis for the claim, there is little precedent within which to seek other than general instruction.

Prosser and Wade in their work, *Cases and Materials on Torts*, 5th Edition (1971), p. 150 state:

"Negligence is the word used to describe the conduct of the defendant. But a cause of action for negligence requires more than such conduct. There must be a duty, and there must be consequences. The traditional formula for the elements necessary to such a cause of action include the following:

1. A duty, which is an obligation *recognized by law*, requiring the actor to conform to a certain standard of conduct, for the protection of others against unreasonable risks. (Emphasis supplied)

2. A failure to conform to the standard required. This is commonly called the breach of duty. These two elements go to make up what the courts usually have called negligence; but the term frequently is applied to the second alone. Thus, it may be said that the defendant was negligent but is not liable because he was

under no duty to the plaintiff not to be . . . ."

■ Essentially, the plaintiffs claim the defendants breached a duty they owed Ronny Zamora. That duty, it is suggested, was generally to avoid making "violent" shows available for voluntary consumption by him and his parents. Plaintiffs do not suggest defendants breached a statutory duty. No supporting case or common law basis (other than the most general) is asserted as the underpinning for the claim. Yet, this Court is asked to determine, as a matter of law, that the allegations in the complaint are sufficient to create a cause of action against the defendants. The questions of duty and proximate cause are, initially at least, questions of law and here,

"[I]t becomes essentially a question of whether the policy of the law will extend the responsibility for the conduct to the consequences which have in fact occurred." Prosser Law of Torts, Section 42 at 244–45 (4th Ed.1971).

Is there or should there be here "an obligation, recognized by the law requiring the actor to conform to a certain standard of conduct . . . ." *Simon v. Tampa Electric Co.*, 202 So.2d 209, 213 (Fla. 2nd DCA 1967). As there is no such obligation (as demanded by plaintiffs) presently articulated in the law, the merit—the legal validity—of the claim must be examined. In so doing, a consideration of the commentary of Harper and James "Law of Torts" Vol. 2 (1956), p. 1132, Section 20.4 is appropriate.

"It should be noted at this point that many courts and legal writers have stressed the fact that policy considerations underlie the doctrine of proximate cause. Of course, they do, but the policies actually involved often fail to get explicit treatment. One consideration which is common to all cases under any system is the practical need to draw the line somewhere so that liability will not crush those on whom it is put. Even under comprehensive social insurance for all vicissitudes to the body there would have to be limits on the kinds of injuries to be compensated (many kinds like wor-

ry—loss of enjoyment, prestige, etc., probably would not be) and on the amount of compensation."

and from p. 1133

"another policy consideration which pervades all the cases is the need to work out rules which are feasible to administer and yield a workable degree of certainty."

■ Such considerations, no doubt, fathered the common law doctrine applied in Florida, that negligence unconnected with physical injury will not provide the basis (the legal "cause") for mental or emotional injuries, *Kirksey v. Jernigan,* (Fla.1950) 45 So.2d 188; *Ellington v. United States,* (M.D.Fla.) 404 F.Supp. 1165, except in limited circumstances;[1] the concept that the nature of the claims presented in *Ultramares Corp. v. Touche,* 255 N.Y. 170, 174 N.E. 441 (1931) would cause exposure to the actor of "indeterminate" classes, amounts and times, and the statement of the 5th Circuit in *DeBardeleben Marine Corp. v. United States,* 451 F.2d 140, 148 (5th Cir. 1971):

"[T]he usual publishers of newspapers, treatises, and maps lack the financial resources to compensate an indeterminate class who might read their work. Potential liability would have a staggering deterrent effect on potential purveyors of printed material."

Of interest also is the holding and language of *Yuhas v. Mudge,* 129 N.J.Super. 207, 322 A.2d 824 (1974) where the plaintiff was injured by a product advertised in defendant's magazine.

"To impose the suggested broad legal duty upon publishers of nationally circulated magazines, newspapers and other publications, would not only be impractical and unrealistic, but would have a staggering adverse effect on the commercial world and our economic system. For the law to permit such exposure to those in the publishing business who in good faith accept paid advertisements for a myriad of products would open the doors 'to a liability in an indeterminate amount for an indeterminate time to an indeterminate class.'" *Id.* at 825.

■ The complex of weaknesses presented by plaintiffs' complaint join in requiring dismissal.[2] The generality which gives rise to defendants' purely procedural attack also requires the finding that the plaintiffs seek the imposition of a duty (a standard of care) which has no valid basis and would be against public policy. A recognition of the "cause" claimed by the plaintiffs would provide no recognizable standard for the television industry to follow. The impositions pregnant in such a standard are awesome to consider. Here the three major networks are charged with anticipating the minor's alleged voracious intake of violence on a voluntary basis; his parents' apparent acquiescence in this course, presumably without recognition of any problem and finally that young Zamora would respond with a criminal act of the type in question.[3] Again, wholly apart from additional procedural problems which should be noted,[4] the

---

1. *See, e. g., Gilliam v. Stewart,* 291 So.2d 593 (Fla.1974); *Gibson v. Greyhound Buslines, Inc.,* 409 F.Supp. 321 (M.D.Fla.1976); *Crane v. Loftin,* 70 So.2d 574 (Fla.1954). Florida does recognize the tort of intentional infliction of emotional distress, but nothing in the complaint is alleged which would support such an action which under Florida law must amount to conduct exceeding all bounds which could be tolerated by society and which is especially calculated to cause mental damage. *Slocum v. Food Fair Stores of Florida, Inc.,* 100 So.2d 396 (Fla. 1958). The only exceptions recognized are manifestly foreseeable criminal acts. *Nicholas v. Miami Burglar Alarm Co., Inc.,* 339 So.2d 175 (Fla.1976); *Vining v. Avis Rent-A-Car Systems Inc.,* 354 So.2d 54, 56 (Fla.1978).

2. The allegations, on the face of the complaint are impermissibly vague and overbroad. *See, Erznoznik v. City of Jacksonville,* 422 U.S. 205, 217–18, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975); *Rosenbloom v. Metromedia,* 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971); *Ashton v. Kentucky,* 384 U.S. 195, 200, 86 S.Ct. 1407, 16 L.Ed.2d 469 (1966).

3. Under Florida law a criminal act intervening breaks the chain of causation except where such act is foreseeable.

4. *Arnst v. Estes,* 136 Me. 272, 8 A.2d 201, alleged joint tort feasors are joint only in that they are joined together. The right of action, if any, rises from separate and disconnected conduct.

question is appropriate; how and why should the Court create such a wide expansion in the law of torts in Florida? (passing for the moment the important considerations presented by the First Amendment). The clear answer is that such expansion is not warranted. Indeed, this Court lacks the legal and institutional capacity to identify isolated depictions of violence, let alone the ability to set the standard for media dissemination of items containing "violence" in one form or the other. Airway dissemination is, and to some extent, should be regulated,[5] but not on the basis or by the procedure suggested by the plaintiffs.

█ It bears repeating that the plaintiffs have elected not to amend, perhaps because no more adequate statement of their claims could be presented. Stripped of conclusory language, the standard demanded is so devoid of guidance and so lacking in a showing of legal cause that the complaint must be dismissed.

As a final observation on the question of defendants' alleged "duty", there is an interesting, though not legally decisive, nexus between the negligence duty considerations claimed for here and the language of first amendment "prior restraint" cases. From *Shuttlesworth v. Birmingham,* 394 U.S. 147, 150–51, 89 S.Ct. 935, 938, 22 L.Ed.2d 162, (involving a parade permit ordinance) the following is pertinent:

> "This ordinance as it was written, therefore, fell squarely within the ambit of many decisions of this Court over the last 30 years, holding that a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective and definite standards to guide the licensing authority, is unconstitutional."

**5.** *FCC v. Pacifica Foundation,* 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978); *Columbia Broadcasting, Inc. v. Democratic National Committee,* 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772.

**6.** V. Blasi, The Checking Valve in First Amendment Theory, American Bar Foundation Journal, Volume 1977, Summer No. 3.

## II. *THE FIRST AMENDMENT*

The freedom of one is often the concern of another. It has been so and shall be as the nation grows. Indeed, the complexity of our developing society has spawned collisions of these concerns and freedoms much more frequently than in past years. Understandably, the "freedom" amendments have, in more recent decades been the subject of regular review and decision.[6]

█ However, as much of a concern as those which cause us to review the extent of our freedoms, is the danger of finding contemporary justifications in the excesses of the moment. The importance of the First Amendment to our freedoms as a whole cannot be overemphasized. It is the lens through which the operations of government are viewed and the support and protection for the commentary which may result. Thus any action, legislative or otherwise which has as its purpose placing limitations upon freedom of expression must be viewed with suspicion.

Here the plaintiffs suggest that an award of damages would not act as a "restraint" as they seek recompense for past wrongs.[7] This position scarcely requires answer. Clearly, the imposition of civil responsibility for damages would have an impact upon and indeed, act as a restraint on the defendants' exercise of their asserted first amendment rights. *New York Times v. Sullivan,* 376 U.S. 254, 277, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

As a partial predicate for the observations to follow, general reference should be made to *Landmark Communications, Inc. v. Virginia,* 435 U.S. 829, 98 S.Ct. 1535, 56 L.Ed.2d 1, 1978. In reversing the conviction of the Virginia Pilot, a Landmark newspaper, for violating a Virginia ordinance, the Court stated (discussing the bal-

**7.** Counsel for the plaintiffs argued at the hearing on the motions to dismiss that he did not seek to prevent programming of the type in question. Rather, he simply wants damages if properly obtainable.

ancing of state and federal interests and "clear and present danger") P. 843 of 435 U.S., p. 1544 of 98 S.Ct.

"Mr. Justice Brandeis was even more pointed in his concurrence in *Whitney v. California,* 274 U.S. 357, 378–379, 47 S.Ct. 641, 71 L.Ed. 1095,

'[a legislative declaration] does not preclude inquiry into the question whether, at the time and under the circumstances, the conditions existed which are essential to validity under the Federal Constitution. . . . Whenever the fundamental rights of free speech are alleged to have been invaded, it must remain open to a defendant to present the issue whether there actually did exist at the time a clear danger; whether the danger, if any, was imminent; and whether the evil apprehended was one so substantial as to justify the stringent restriction interposed by the legislature."

The plaintiffs here seek, in fact, some kind of pervasive judicial restriction upon the three defendants incident to a determination of the violation of a heretofore undefined duty. The defects in the complaint have already been discussed. The point here, of course, is that improper judicial limitation of first amendment rights is as offensive as unwarranted legislative incursion into that area. *New York Times v. Sullivan,* supra.

It was the judgment of the authors of the Constitution that society's best interests would be served by free expression, not limited by punishment or other sanction; and this concept has consistently been reflected in relevant judicial development except with respect to certain narrowly limited classes of speech. Those areas which are not afforded constitutional protection involve "the lewd and obscene, the profane, the libelous and the insulting or 'fighting' words . . . ." *Chaplinsky v. New Hampshire,* 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942). None of these exceptions would appear to apply here.

Rather, the plaintiffs complain of Ronny Zamora's continuing exposure to "violence," and his alleged response to it. The complaint does not suggest that the event in question was a reaction to any specific program of an inflammatory nature;[8] or that the minor plaintiff was "incited" or goaded into unlawful behavior by a particular call to action.[9] Rather, it is asserted that at some point (unspecified in any way) he became captive to the violence he viewed and turned to unlawful conduct. The instruction of *Cohen v. California,* 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) is helpful.

"This Court has also held that the States are free to ban the simple use, without a demonstration of additional justifying circumstances, of so-called 'fighting words,' those personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction. *Chaplinsky v. New Hampshire,* 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). While the four-letter word displayed by Cohen in relation to the draft is not uncommonly employed in a personally provocative fashion, in this instance it was clearly not "directed to the person of the hearer." *Cantwell v. Connecticut,* 310 U.S. 296, 309, 60 S.Ct. 900, 84 L.Ed. 1212, 1221, 128 A.L.R. 1352 (1940). No individual actually or likely to be present could reasonably have regarded the words on appellant's jacket as a direct personal insult. Nor do we have here an instance of the exercise of the State's police power to prevent a speaker from intentionally provoking a given group to hostile reaction.

.   .   .   .   .

The rationale of the California court is plainly untenable. At most it reflects an "undifferentiated fear or apprehension of disturbance [which] is not enough to overcome the right to freedom of expression." *Tinker v. Des Moines Indep. Community*

---

8.   *National Broadcasting Co., Inc. et al. v. Olivia Niemi,* 434 U.S. 1354, 98 S.Ct. 705, 54 L.Ed.2d 742.

9.   *Yates v. United States,* 354 U.S. 298, 322, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957).

*School Dist.*, 393 U.S. 503, 508, 89 S.Ct. 733, 21 L.Ed.2d 731, 739 (1969). We have been shown no evidence that substantial numbers of citizens are standing ready to strike out physically at whoever may assault their sensibilities with execrations like that uttered by Cohen. There may be some persons about with such lawless and violent proclivities, but that is an insufficient base upon which to erect, consistently with constitutional values, a governmental power to force persons who wish to ventilate their dissident views into avoiding particular forms of expression. The argument amounts to little more than the self-defeating proposition that to avoid physical censorship of one who has not sought to provoke such a response by a hypothetical coterie of the violent and lawless the States may more appropriately effectuate that censorship themselves. Cf. *Ashton v. Kentucky,* 384 U.S. 195, 200, 86 S.Ct. 1407, 16 L.Ed.2d 469, 472 (1966); *Cox v. Louisiana,* 379 U.S. 536, 550–551, 85 S.Ct. 453, 13 L.Ed.2d 471, 481, 482 (1965)."

■ Television is "press." While there is ". . . no doubt that moving pictures, like newspapers and radio, are included in the press whose freedom is guaranteed by the First Amendment," [10] it is nonetheless ". . . the right of the viewers and listeners, not the right of the broadcasters, which is paramount. . . . It is the right of the public to receive suitable access to social, political, esthetic, moral and other ideas and experiences which is crucial here. That right may not be abridged either by Congress or the F.C.C." [11]

Because of the nature of and limitations incident to broadcasting, Congress has giv-en the F.C.C. carefully circumscribed control over the transmissions coming within the purview of the legislation.[12]

"From these provisions it seems clear that Congress intended to permit private broadcasting to develop the widest journalistic freedom consistent with its public obligations. Only when the interests of the public are found to outweigh the private journalistic interests of the broadcasters will government power be asserted within the framework of the Act." [13]

The same considerations require that the Courts take a somewhat different legal approach as well [14] but one which does not control here.

■ Clearly one of the principal interests of the viewing public is to receive a variety of programs. While a discussion of access and its suitability is not entirely on point here, it is appropriate to note that the right of the public to have broad access to programming and the right of the broadcaster to disseminate should not be inhibited by those members of the public who are particularly sensitive [15] or insensitive.[16] It is of further interest that for over 40 years the administration of the "Radio Act" and its successor the "Communications Act" has called for a sensitive development and balancing of the rights of the public and broadcasters. In that period, the machinery has been created by which those rights (within legislative and constitutional limits) have been protected. In passing, it is worth noting, perhaps for no more than moral or argumentative support to this Court's position, that the F.C.C. has not acted, as to these defendants in the programming area in question.

10. *United States v. Paramount Pictures,* 334 U.S. 131, 166, 68 S.Ct. 915, 933, 92 L.Ed. 1260.

11. *Red Lion Broadcasting Co. v. F. C. C.,* 395 U.S. 367, 390, 89 S.Ct. 1794, 1806–07, 23 L.Ed.2d 371; *Columbia Broadcasting, Inc. v. Democratic Nat'l Committee,* 412 U.S. 94, 102, 93 S.Ct. 2080, 36 L.Ed.2d 772.

12. 47 U.S.C. §§ 303, 326.

13. *Columbia Broadcasting, Inc. v. Democratic, etc., Ibid* at 412 U.S. p. 110, 93 S.Ct. p. 2090.

14. *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125.

15. *Pinkus v. United States,* 436 U.S. 293, 98 S.Ct. 1808, 56 L.Ed.2d 293, the consideration of instructions in a pornography case is of interest here.

16. *Kingsley Corp. v. Regents of Univ. of N. Y.,* 360 U.S. 684, 689, 79 S.Ct. 1362, 3 L.Ed.2d 1512.

Before moving from this brief consideration of the Communications Act and those limitations on broadcasting incident to that legislation, it is proper to again point out that congressional intent was to avoid "government censorship"[17] and interference with "free speech."[18] The plaintiffs' reliance on *Federal Communications Commission v. Pacifica*, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978) is misplaced because of both the factual and legal bases for that decision.

Reduced to basics, the plaintiffs ask the Court to determine that unspecified "violence" projected periodically over television (presumably in any form) can provide the support for a claim for damages where a susceptible minor has viewed such violence and where he has reacted unlawfully. Indeed, it is implicit in the plaintiffs' demand for a new duty standard, that such a claim should exist for an untoward reaction on the part of any "susceptible" person. The imposition of such a generally undefined and undefinable duty would be an unconstitutional exercise by this Court in any event. To permit such a claim by the person committing the act, as well as his parents, presents an A Fortiori situation which would, as suggested above, give birth to a legal morass through which broadcasting would have difficulty finding its way.

At the risk of overdeveloping the apparent, I suggest that the liability sought for by plaintiffs would place broadcasters in jeopardy for televising Hamlet, Julius Caesar, Grimm's Fairy Tales; more contemporary offerings such as All Quiet On The Western Front, and even The Holocaust, and indeed would render John Wayne a risk not acceptable to any but the boldest broadcasters.

Further, the imposition of the duty claimed would discriminate among television productions on the basis of content[19] and not on the basis of any of the first amendment limitations referred to above. The works of creative artists and entertainers must be protected.[20] The First Amendment casts a "heavy burden" on those who seek to censor.[21] The plaintiffs' complaint wholly fails to allege any specific broadcasting conduct which is unprotected because it incited young Zamora to commit the crime in question.

"Advocacy of conduct proscribed by law is not, as Mr. Justice Brandeis long ago pointed out, 'a justification for denying free speech where the advocacy falls short of incitement and there is nothing to indicate that the advocacy would be immediately acted on.' *Whitney v. California*, 274 U.S. 357, at page 376 [47 S.Ct. 641, at page 648, 71 L.Ed. 1095, 1106] (concurring opinion). 'Among free men, the deterrents ordinarily to be applied to prevent crime are education and punishment for violations of the law, not abridgment of the rights of free speech * * *.' Id., 274 U.S. at 378 [47 S.Ct. at paae 649]." *Kingsley Corp. v. Regents of U. of N. Y.* 360 U.S. 684, 689, 79 S.Ct. 1362, 1365–66, 3 L.Ed.2d 1512.

Similarly, from *Hess v. Indiana*, 414 U.S. 105, 109, 94 S.Ct. 326, 329, 38 L.Ed.2d 303:

"And since there was no evidence or rational inference from the import of the language, that his words were intended to produce, and likely to produce, *imminent* disorder, those words could not be punished by the state on the ground that they had 'a tendency to lead to violence.' "

■ Reference to the "incitement" cases and to the several points discussed above should not obscure the obvious. In almost all television dramas which depict some violence, the "goods" win and the "bads" lose. Without question, television programming presents problems and the study of these continues. One day, medical or other sci-

---

**17.** 412 U.S. 105, 93 S.Ct. 2080.

**18.** 47 U.S.C. § 326.

**19.** *Erznoznik v. City of Jacksonville*, supra.

**20.** *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501, 72 S.Ct. 777, 96 L.Ed. 1098.

**21.** *Bazaar v. Fortune*, 476 F.2d 570 (5th Cir. 1973).

ences with or without the cooperation of programmers may convince the F.C.C. or the Courts that the delicate balance of First Amendment rights should be altered to permit some additional limitations in programming. The complaint before the Court in no way justifies such a pursuit. Upon the election of the plaintiffs not to amend, the complaint is dismissed with prejudice and judgment shall be entered for defendants.