712 So.2d 681 (1998)
Patsy Ann BYERS, et al.
v.
Sarah EDMONDSON, et al.
No. 97 CA 0831.
Court of Appeal of Louisiana, First Circuit.
May 15, 1998.
*683 Rick A. Caballero, Baton Rouge, Joseph H. Simpson, Amite, Ronald S. Macaluso, Hammond, for Plaintiffs/Appellants Patsy Ann and Lonnie Wayne Byers.
James Boren, Baton Rouge, for Defendant Sarah Edmondson.
Timonthy G. Schafer, New Orleans, for Defendants James and Suzanne Edmondson.
Jack M. Weiss, New Orleans, Alton B. Lewis, Hammond, for Defendants/Appellees Time Warner Entertainment Company, et al.
Kyle Schonekas, New Orleans, for Defendant/Appellee Time Warner, Inc.
Before CARTER and FITZSIMMONS, JJ., and CHIASSON,[1] J. Pro Tem.
CARTER, Judge.
This is an appeal from a trial court judgment dismissing a negligence and intentional tort claim on a peremptory exception raising the objection of no cause of action.

FACTS
This suit arises from the shooting of plaintiff, Patsy Byers (Byers) by Sarah Edmondson (Edmondson) and Benjamin Darrus (Darrus). According to the allegations of Byers'[2] petition, Edmondson and Darrus acted together when Edmondson shot and seriously wounded Byers during an armed robbery of a Time Saver convenience store in Ponchatoula, Louisiana. Darrus accompanied Edmondson upon the shooting spree, encouraged her to engage in the shooting spree and assisted Edmondson by driving her to and from the armed robbery and shooting. Neither Edmondson nor Darrus attempted to obtain medical assistance for Byers after shooting her. The shooting, which took place on March 8, 1995, rendered Byers a paraplegic.
On July 26, 1995, Byers filed suit against Edmondson and Darrus for the damages sustained by Byers and her family as a result of the armed robbery and shooting. In early March 1996, Byers filed a first supplemental and amending petition for damages, adding Edmondson's parents and several insurance companies as defendants. In this petition, Byers alleged that the gun used in the shooting *684 was obtained from a cabin owned by Edmondson's parents.
On the same date, Byers filed a second supplemental and amending petition for damages, through which she named Warner Home Video, Inc., Warner Brothers, Inc., Time Warner Entertainment Company, L.P., Time Warner, Inc., Regency Enterprises,[3] Alcor Films, J.D. Productions and Oliver Stone as additional defendants. Byers restated the same prior allegations with respect to the occurrence of the shooting and the obtaining of the weapon used in the shooting. The new allegations asserted that Edmondson and Darrus "went upon a crime spree culminating in the shooting and permanent injury to Patsy Ann Byers as a result of seeing and becoming inspired by the movie `Natural Born Killers' produced, directed and distributed by the Hollywood defendants."[4] The amended petition further alleged that "[a]ll of the Hollywood defendants are liable, more particularly, but not exclusively for, distributing a film which they knew or should have known would cause and inspire people such as ... Edmondson and... Darrus, to commit crimes such as the shooting of Patsy Ann Byers, and for producing and distributing a film which glorified the type of violence [Edmondson and Darrus] committed against Patsy Ann Byers by treating individuals who commit such violence as celebrities and heroes, as well as for such other negligence as will be learned during discovery and shown at trial of this matter."
On September 25, 1996, defendant Time Warner Entertainment Company, L.P. (TWEC), filed a motion to strike any references to Warner Home Video, Inc., and Warner Brothers, Inc., as defendants. TWEC contended that these two entities were unincorporated divisions of TWEC, which was already a named defendant in the suit.[5] On this same date, Time Warner, Inc., filed a declinatory exception raising the objection of lack of personal jurisdiction and a peremptory exception raising the objection of no cause of action. Additionally, TWEC, Alcor Film & TV GMBH & Co. Produktions KG, Jane and Don Productions Inc., and Oliver Stone (the Warner defendants)[6] filed their own peremptory exception raising the objection of no cause of action on September 25, 1996. In the exception, the Warner defendants asserted that they owed no duty to plaintiffs to ensure that none of the viewers of the movie would decide to imitate actions depicted in the fictional film. The Hollywood defendants also denied that they owed a duty to prevent harm inflicted by others absent a "special relationship" obligating the defendant to protect the plaintiff from such harm. They further asserted that imposition of such a duty would violate the First Amendment to the United States Constitution and Article 1, Section 7 of the Louisiana Constitution. A hearing on the exception was set for December 16, 1996.
A week before the hearing, on December 9, 1996, Byers filed a third supplemental and amending petition for damages through which she added and supplemented the allegations with respect to the actions and liability of the Warner defendants. Paragraph 1 of plaintiffs' third supplemental and amending petition for damages provides:
Plaintiffs desire to supplement and amend paragraph V.(E). of their Petition to read as follows:

V.(E).
All of the Hollywood defendants are liable, more particularly, but not exclusively:

*685 A) for producing and distributing a film (and marketing same on videotape) which they knew, intended, were substantially certain, or should have known would cause or incite persons such as defendants, Sarah Edmondson, and Benjamin Darrus (via subliminal suggestion or glorification of violent acts) to begin, shortly after repeatedly viewing same, crime sprees such as that which led to the shooting of Patsy Ann Byers;
B) for negligently and/or recklessly failing to take steps to minimize violent content of the video or to minimize glorification of senselessly violent acts and those who perpetrate such conduct;
C) by intentionally, recklessly, or negligently including in the video subliminal images which either directly advocated violent activity or which would cause viewers to repeatedly view the video and thereby become more susceptible to its advocacy of violent activity;[7]
D) for negligently and/or recklessly failing to warn viewers of the potential deleterious effects upon teenage viewers caused by repeated viewing of the film/video and of the presence of subliminal messages therein; and
E) as well as for other such intentional, reckless, or negligent acts will [sic] be learned during discovery and shown at trial of this matter.
Two days later, Byers filed a memorandum opposing the Warner defendants' exceptions raising the objection of no cause of action. In this opposition, Byers asserted that Edmondson and Darrus 1) repeatedly viewed the movie on videotape, sometimes under the influence of mind-altering drugs; 2) desired to emulate the protagonists of the video by obtaining a gun and ammunition; and 3) began their own reenactment of the "Mickey and Mallory" story from the film, resulting in the murder of a Mississippi cotton gin owner and brutal attempted murder of Patsy Byers.
On the morning of the hearing, the Warner defendants filed a reply memorandum, noting that a similar claim filed in Georgia against the Warner defendants as a result of a Georgia murder by a couple who was allegedly imitating the actions of the characters "Mickey and Mallory" from "Natural Born Killers," had recently been dismissed for the failure to state a cause of action. Subsequently, on December 23, 1996, defendant Time Warner, Inc., filed a declinatory exception of lack of jurisdiction and a peremptory exception raising the objection of no cause of action in response to Byers' third supplemental and amending petition.
After taking the matter under advisement, the trial court granted the peremptory exceptions raising the objection of no cause of action, finding that the "law simply does not recognize a cause of action such as that presented in [Byers'] petition." Because counsel for Byers did not contend Byers could otherwise amend the petition to attempt to state any other cause of action as against the Warner defendants, the court did not grant leave to amend. A judgment was signed on January 23, 1997, sustaining the peremptory exceptions raising the objection of no cause of action and dismissing Byers' suit as to those claims against the Warner defendants.[8] Byers filed a motion for new trial, which was denied by the trial court.[9]
*686 Byers appealed the judgment of the trial court, assigning as error the trial court's finding that Byers' cause of action was proscribed by Louisiana law and United States and Louisiana constitutional guarantees of free speech.

PEREMPTORY EXCEPTION RAISING OBJECTION OF NO CAUSE OF ACTION
The objection of no cause of action is properly raised by the peremptory exception. The exception of no cause of action questions "whether the law extends a remedy to anyone under the factual allegations of the petition." Louisiana Paddlewheels v. Louisiana Riverboat Gaming Commission, 94-2015, p. 5, n. 3 (La.11/30/94), 646 So.2d 885, 888, n. 3; Treasure Chest Casino, L.L.C. v. Parish of Jefferson, 96-1010, p. 5 (La.App. 1st Cir. 3/27/97), 691 So.2d 751, 754, writ denied, 97-1066 (La.6/13/97), 695 So.2d 982. The purpose of an exception pleading the objection of no cause of action is to determine the sufficiency in law of the petition. City of New Orleans v. Board of Commissioners of Orleans Levee District, 93-0690, p. 2 (La.7/5/94), 640 So.2d 237, 241; Treasure Chest Casino, L.L.C. v. Parish of Jefferson, 691 So.2d at 754.
Generally, no evidence may be introduced to support or controvert the exception. Treasure Chest Casino, L.L.C. v. Parish of Jefferson, 691 So.2d at 754. However, as set forth in City National Bank of Baton Rouge v. Brown, 599 So.2d 787, 789 (La.App. 1st Cir.), writ denied, 604 So.2d 999 (La.1992), the jurisprudence recognizes an exception to this rule, which allows the court to consider evidence which is admitted without objection to enlarge the pleadings. Treasure Chest Casino, L.L.C. v. Parish of Jefferson, 691 So.2d at 754. Otherwise, the exception is triable on the face of the pleadings, and, for the purposes of determining the issues raised by the exception, the well-pleaded facts in the petition must be accepted as true. City of New Orleans v. Board of Commissioners of Orleans Levee District, 640 So.2d at 241; Treasure Chest Casino, L.L.C. v. Parish of Jefferson, 691 So.2d at 754. The court must determine if the law affords plaintiff a remedy under those facts. Treasure Chest Casino, L.L.C. v. Parish of Jefferson, 691 So.2d at 754.
When a petition states a cause of action as to any ground or portion of the demand, an exception raising the objection of no cause of action must be overruled. Any doubts are resolved in favor of the sufficiency of the petition. Treasure Chest Casino, L.L.C. v. Parish of Jefferson, 691 So.2d at 755.
When the grounds of the objection pleaded by the peremptory exception may be removed by amendment of the petition, the judgment sustaining the exception shall order such amendment within the delay allowed by the court. If the grounds of the objection cannot be so removed, or if plaintiff fails to comply with the order to amend, the action shall be dismissed. LSA-C.C.P. art. 934. Clearly, even if a petition fails to state a cause of action, if the grounds of the objection can be removed by amendment, the plaintiff should be allowed to amend his demand. However, where the grounds for the objection cannot be removed by amendment, the trial court is not required to allow the pleadings to be amended. Treasure Chest Casino, L.L.C. v. Parish of Jefferson, 691 So.2d at 755. The decision to allow amendment is within the sound discretion of the trial court. Prudential Insurance Company of America v. CC & F Baton Rouge Development Company, 93-2074, p. 13 (La.App. 1st Cir. 10/7/94), 647 So.2d 1131, 1139.
In resolving the issue of whether Byers has a cause of action against the Warner defendants for the shooting, we must determine if the Warner defendants owed a duty to Byers to prevent her from being shot by *687 two people who viewed "Natural Born Killers" and went on a crime spree shortly thereafter. If we find that such a duty exists under Louisiana law, we must further decide whether the imposition of such a duty violates the guarantee of free speech contained in the First Amendment to the United States Constitution and in Article 1, Section 7 of the Louisiana Constitution.

DUTY
In the petition and supplemental and amending petitions, Byers alleges that the Warner defendants are liable to Byers under Louisiana tort law in that they were negligent and committed an intentional tort. However, before we can find that a cause of action has been set forth based on a negligence or intentional tort theory of recovery under the facts of this case, we must first determine whether a duty was owed by the Warner defendants to Byers. A duty represents a legally enforceable obligation to conform to a particular standard of conduct. Penton v. Clarkson, 93-0657, p. 6 (La.App. 1st Cir. 3/11/94), 633 So.2d 918, 922. Louisiana courts have traditionally applied a duty-risk analysis to determine whether a plaintiff has stated a cause of action in tort against a particular defendant. See Meany v. Meany, 94-0251, p. 6 (La.7/5/94), 639 So.2d 229, 233. This approach is most helpful in cases where the only issue is whether the defendant stands in any relationship to the plaintiff as to create any legally recognized obligation of conduct for the plaintiff's benefit. Pitre v. Opelousas General Hospital, 530 So.2d 1151, 1155 (La.1988). The existence of duty is a question of law for the court to decide from the facts surrounding the occurrence in question. Harris v. Pizza Hut of Louisiana, Inc., 455 So.2d 1364, 1371 (La.1984). When no duty exists, a court will dismiss a petition as a matter of law for failure to state a cause of action. See Pitre v. Opelousas General Hospital, 530 So.2d at 1158.
The factual allegations which must be accepted as true are that Edmondson and Darrus viewed "Natural Born Killers" and began a crime spree shortly thereafter; Byers was shot while Edmondson and Darrus were on this crime spree; the Warner defendants produced, directed and marketed "Natural Born Killers" for the movie theatres and for video; the Warner defendants did not warn viewers of the film or video of the potential deleterious effects that repeated viewing of the film could have on teenage viewers; the Warner defendants were negligent through the production of a film which they knew, should have known or intended would incite people such as Edmondson and Darrus to commit violent acts such as the one committed against Byers; the film glorified the type of violence committed by Edmondson and Darrus against Byers through its treatment of individuals in the film who committed such acts as celebrities and heroes; and the Warner defendants failed to take steps to minimize the violent content of the film or the glorification of senselessly violent acts in the film. Thus, Byers essentially contends that the Warner defendants owed her a duty to not produce this film in the form in which it was released and/or to protect her from viewers who would imitate the violent acts or crimes committed by the film's two main characters and cause her harm.
We recognize that in Louisiana, a defendant does not owe a duty to protect a person from the criminal acts of third parties absent a special relationship which obligates the defendant to protect the plaintiff from such harm. Lambert v. Word of Faith Ministries, 95-1436, p. 2 (La.App. 3rd Cir. 4/17/96), 673 So.2d 1150, 1151, writ denied, 96-1001 (La.5/31/96), 673 So.2d 1037. We further note that in the present case, Byers has not, nor can she allege the existence of such a special relationship.
However, we agree with Byers that based on the allegations of the petition which we must accept as true for purposes of a peremptory exception raising the objection of no cause of action, the Warner defendants are liable as a result of their misfeasance in that they produced and released a film containing violent imagery which was intended to cause its viewers to imitate the violent imagery. If the intentional action allegations contained in the petition can be proven at trial, the imposition of a duty would be warranted based on the same rationale used by the California court in Weirum v. RKO General, *688 Inc., 15 Cal.3d 40, 123 Cal.Rptr. 468, 539 P.2d 36 (1975) to impose a similar duty.
In Weirum, a radio station was liable for injuries caused by the negligent acts of its listeners responding to a broadcast by one of the radio's disc jockeys. The specific broadcast was made in conjunction with a contest sponsored by the station wherein listeners were encouraged and directed to be the first to locate a travelling disc jockey. The station would periodically announce the most recent location of the travelling disc jockey. The reward was money and prizes. While two listeners were rushing to find the travelling disc jockey, in response to the most recent broadcast by the station regarding the travelling disc jockey's whereabouts, they forced a third vehicle off the road. The driver of this third vehicle died as a result of the accident. The deceased driver's family filed a civil suit against the radio station. The California court, in imposing liability upon the radio station, found that a duty was owed to prevent the type of harm befallen by the deceased because the risk of harm to the deceased was imminently foreseeable. The court focused on the fact that the radio station directly urged motorist/listeners to immediately speed to a destination if they wanted to receive a prize. Weirum v. RKO General, Inc., 123 Cal.Rptr. 468, 539 P.2d at 40.
If in fact, plaintiffs can prove their allegation that the Warner defendants, through the creation and release of "Natural Born Killers," intended to urge viewers to imitate the criminal conduct of "Mickey and Mallory," the main characters in the film, then the risk of harm to a person such as Byers would be imminently foreseeable, justifying the imposition of a duty upon the Warner defendants to refrain from creating such a film. The breach of this duty would render the Warner defendants liable for the damages inflicted on innocent third parties such as Patsy Byers by viewers of the film imitating the violent imagery depicted in the film.
While we note that courts across the nation have generally refused to hold filmmakers, producers, directors and/or promoters liable for injuries allegedly sustained from others imitating actions or scenes depicted in a film, television broadcast or magazine, or described in a song, many of these dismissals came after the filing of a motion for summary judgment, or even after a trial on the merits and thus, after the parties had the opportunity to conduct discovery pertinent to the alleged facts. See Way v. Boy Scouts of America, 856 S.W.2d 230 (Tex.App. 5th Dist. 1993) (motion for summary judgment granted dismissing plaintiff's claims against the publisher of a firearm advertisement in a magazine which advertisement allegedly caused a fatal firearm injury to plaintiff's son); Yakubowicz v. Paramount Pictures Corporation, 404 Mass. 624, 536 N.E.2d 1067 (1989) (motion for summary judgment granted dismissing plaintiff's claim that the producer of a gang violence film was liable for the murder of plaintiff's son who had viewed the film); Bill v. Superior Court of the City and County of San Francisco, 137 Cal. App.3d 1002, 187 Cal.Rptr. 625 (1st Dist. 1982) (motion for summary judgment granted dismissing plaintiff's claim that the producer of a gang violence film was liable for the shooting of plaintiff's daughter by a third party shortly after both saw the film); DeFilippo v. National Broadcasting Co., Inc., 446 A.2d 1036 (R.I.1982) (motion for summary judgment granted dismissing plaintiff's claim that the broadcast of a hanging stunt on a television program caused the death of plaintiff's son who tried to imitate the stunt); Walt Disney Productions, Inc. v. Shannon, 247 Ga. 402, 276 S.E.2d 580 (1981) (motion for summary judgment granted dismissing plaintiff's claim that the broadcast of a television program caused plaintiff's son to be injured when the son imitated an experiment performed on the television program); and Olivia N. v. National Broadcasting Co., Inc., 126 Cal.App.3d 488, 178 Cal.Rptr. 888 (1st Dist.1981) (judgment of non-suit granted at trial when plaintiff admitted that the film at issue in the suit did not incite the unlawful behavior which injured the plaintiff). It was a rare situation where the dismissal was granted based solely on the allegations contained in the petition.[10]See Zamora v. Columbia *689 Broadcasting System, 480 F.Supp. 199 (S.D.Fla.1979); see also McCollum v. CBS, Inc., 202 Cal.App.3d 989, 249 Cal.Rptr. 187 (2nd Dist.1988). We do not find these two latter cases to be persuasive to our decision in the present case.
In Zamora v. Columbia Broadcasting System, 480 F.Supp. 199, the pleadings did not contain any allegations of intentional conduct by the film producers. In this case, the petition contains allegations that the Warner defendants intended to cause the viewers of "Natural Born Killers" to imitate the conduct of "Mickey and Mallory" and go on crime sprees involving the type of crime committed upon Patsy Byers. In McCollum v. CBS, Inc., 202 Cal.App.3d 989, 249 Cal.Rptr. 187, the lyrics of a song were at issue and the court had the opportunity to examine all of the lyrics before deciding to dismiss the suit. Presently, the entire film is not before the court for examination as it was not introduced as evidence at the hearing on the peremptory exception raising the objection of no cause of action. Accordingly, based on the allegations contained in Byers' petition, we find that Byers has stated a cause of action for an intentional tort against the Warner defendants under Louisiana tort law.
Because we find that under the allegations of the petition, accepted as true, the Warner defendants may owe a duty to Byers and thus, the petition states a cause of action under Louisiana law, we must address the Warner defendants' claim that the imposition of a duty would be in contravention of the guarantee of free speech contained in the First Amendment to the United States Constitution and Article 1, Section 7 of the Louisiana Constitution. Byers contends that the conduct of the Warner defendants in creating "Natural Born Killers" is not protected speech because it falls into two of the exceptions to the First Amendment guarantee of free speech: the obscenity exception and the incitement to imminent lawless activity exception.
First Amendment rights are accorded a preferred place in our democratic society. First Amendment protection extends to a communication, to its source and to its recipients. Above all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content. See McCollum v. CBS, Inc., 249 Cal.Rptr. at 192. The fact a case does not involve government restriction of speech does not prevent the barring of an action by the first amendment. The chilling effect of permitting the imposition of civil liability based on negligence is obviousthe fear of damage awards may be markedly more inhibiting than the fear of prosecution under a criminal statute. See Bill v. Superior Court of the City and County of San Francisco, 187 Cal.Rptr. at 627. Motion pictures are a significant medium for the communication of ideas and are protected by the first amendment just like other forms of expression. Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 501-02, 72 S.Ct. 777, 780, 96 L.Ed. 1098 (1952).
However, the freedom of speech guaranteed by the First Amendment is not absolute. There are certain limited classes of speech which may be prevented or punished by the state consistent with the principles of the First Amendment: (1) obscene speech; (2) libel, slander, misrepresentation, obscenity, perjury, false advertising, solicitation of crime, complicity by encouragement, conspiracy, and the like; (3) speech or writing used as an integral part of conduct in violation of a valid criminal statute; and (4) speech which is directed to inciting or producing imminent lawless action, and which is likely to incite or produce such action. McCollum v. CBS, Inc., 249 Cal.Rptr. at 192-93.
Byers argues that "Natural Born Killers" falls within the incitement to imminent lawless activity exception to the First Amendment. The constitutional guarantee of free speech does not permit a state to forbid or proscribe advocacy of the use of force or of law violation except where such *690 advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action. Brandenburg v. Ohio, 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1969). Thus, to justify a claim that speech should be restrained or punished because it is (or was) an incitement to lawless action, the court must be satisfied that the speech (1) was directed or intended toward the goal of producing imminent lawless conduct and (2) was likely to produce such imminent conduct. Speech directed to action at some indefinite time in the future will not satisfy this test. Moreover, speech does not lose its First Amendment protection merely because it has "a tendency to lead to violence." See Hess v. Indiana, 414 U.S. 105, 108-09, 94 S.Ct. 326, 328-29, 38 L.Ed.2d 303 (1973).
In Byers' third supplemental and amending petition, it is alleged that the Warner defendants intended to incite viewers of the film to begin, shortly after viewing the film, crime sprees such as the one that led to the shooting of Patsy Byers. We must accept this allegation as true for purposes of the peremptory exception raising the objection of no cause of action. Once accepted as true, the film "Natural Born Killers," would fall into the unprotected category of speech directed to inciting or producing imminent lawless action and which is likely to incite or produce such action.
We note that in Rice v. Paladin Enterprises, Incorporated, 128 F.3d 233 (4th Cir.1997), the United States Fourth Circuit Court of Appeal held that the publisher of a book which contained step-by-step instructions on how to be a hit man could be civilly liable for the deaths of victims killed by a third person who followed the instructions in the book to murder the victims. The issue before the court was whether the book was protected under the First Amendment. The court found that the particular book was not protected speech. The United States Supreme Court denied writs. Paladin Enterprises, Incorporated v. Rice, 118 S.Ct. 1515, 140 L.Ed.2d 668 (1998).
In Rice, it was stipulated by Paladin that it not only knew that the book's instructions might be used by murderers, but, it actually intended to provide assistance to murderers and would be murderers.
The U.S. Fourth Circuit further stated:
In other words, the First Amendment might well circumscribe the power of the state to create and enforce a cause of action that would permit the imposition of civil liability, such as aiding and abetting civil liability, for speech that would constitute pure abstract advocacy, at least if that speech were not "directed to inciting or producing imminent lawless action, and... likely to incite or produce such action." Brandenburg, 395 U.S. at 447, 89 S.Ct. at 1829. The instances in which such advocacy might give rise to civil liability under state statute would seem rare, but they are not inconceivable. Cf. Schenck v. United States, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470 (1919) (criminal conspiracy prosecution predicated upon subversive advocacy)....
* * * * * *
After carefully and repeatedly reading Hit Man in its entirety, we are of the view that the book so overtly promotes murder in concrete, nonabstract terms that we regard as disturbingly disingenuous both Paladin's cavalier suggestion that the book is essentially a comic book whose "fantastical" promotion of murder no one could take seriously, and amici's reckless characterization of the book as "almost avuncular," see Br. of Amici at 8-9. The unique text of Hit Man alone, boldly proselytizing and glamorizing the crime of murder and the "profession" of murder as it dispassionately instructs on its commission, is more than sufficient to create a triable issue of fact as to Paladin's intent in publishing and selling the manual.
* * * * * *
Paladin, joined by a spate of media amici, including many of the major networks, newspapers, and publishers, contends that any decision recognizing even a potential cause of action against Paladin will have far-reaching chilling effects on the rights of free speech and press. See Br. of Amici at 3, 22 ("Allowing this lawsuit to survive will disturb decades of First Amendment jurisprudence and jeopardize free speech *691 from the periphery to the core.... No expressionmusic, video, books, even newspaper articleswould be safe from civil liability."). That the national media organizations would feel obliged to vigorously defend Paladin's assertion of a constitutional right to intentionally and knowingly assist murderers with technical information which Paladin admits it intended and knew would be used immediately in the commission of murder and other crimes against society is, to say the least, breathtaking. But be that as it may, it should be apparent from the foregoing that the indisputably important First Amendment values that Paladin and amici argue would be imperiled by a decision recognizing potential liability under the peculiar facts of this case will not even arguably be adversely affected by allowing plaintiffs' action against Paladin to proceed. In fact, neither the extensive briefing by the parties and the numerous amici in this case, nor the exhaustive research which the court itself has undertaken, has revealed even a single case that we regard as factually analogous to this case.
Paladin and amici insist that recognizing the existence of a cause of action against Paladin predicated on aiding and abetting will subject broadcasters and publishers to liability whenever someone imitates or "copies" conduct that is either described or depicted in their broadcasts, publications, or movies. This is simply not true. In the "copycat" context, it will presumably never be the case that the broadcaster or publisher actually intends, through its description or depiction, to assist another or others in the commission of violent crime; rather, the information for the dissemination of which liability is sought to be imposed will actually have been misused vis-a-vis the use intended, not, as here, used precisely as intended. It would be difficult to overstate the significance of this difference insofar as the potential liability to which the media might be exposed by our decision herein is concerned.
And, perhaps most importantly, there will almost never be evidence proffered from which a jury even could reasonably conclude that the producer or publisher possessed the actual intent to assist criminal activity. In only the rarest case, as here where the publisher has stipulated in almost taunting defiance that it intended to assist murderers and other criminals, will there be evidence extraneous to the speech itself which would support a finding of the requisite intent; surely few will, as Paladin has, "stand up and proclaim to the world that because they are publishers they have a unique constitutional right to aid and abet murder." Appellant's Reply Br. at 20. Moreover, in contrast to the case before us, in virtually every "copycat" case, there will be lacking in the speech itself any basis for a permissible inference that the "speaker" intended to assist and facilitate the criminal conduct described or depicted. Of course, with few, if any, exceptions, the speech which gives rise to the copycat crime will not directly and affirmatively promote the criminal conduct, even if, in some circumstances, it incidentally glamorizes and thereby indirectly promotes such conduct.
128 F.3d at 249, 254, 265.
As previously indicated, plaintiffs have alleged the very intent on the part of the Warner defendants referred to by the Rice court. Because this case is before us on a peremptory exception pleading the objection of no cause of action, we must accept this allegation as true. However, in holding that plaintiffs' allegations of intent state a cause of action, we do not address the issue of whether the Warner defendants may later invoke the protection of the First Amendment guarantee of free speech to bar Byers' claim after discovery has taken place. It is only by accepting the allegations in Byers' petition as true that we conclude that the film falls into the incitement to imminent lawless activity exception to the First Amendment. We agree with Rice v. Paladin Enterprises, Incorporated, 128 F.3d 233, that the mere foreseeability or knowledge that the publication might be misused for a criminal purpose is not sufficient for liability. Proof of intent necessary for liability in cases such as the instant one will be remote and even rare, but at this stage of the proceeding *692 we find that Byers' cause of action is not barred by the First Amendment. Since we have determined that the allegations of plaintiffs' petition bring the case at this stage into the incitement to imminent lawless activity exception, we need not address Byers' claim that the film constitutes obscene speech.

CONCLUSION
For these reasons, the judgment of the trial court is reversed and the matter is remanded to the trial court for further proceedings consistent with the views expressed herein. Costs of this appeal are assessed to the Warner defendants.
REVERSED AND REMANDED.
FITZSIMMONS, J., assigns additional reasons.
FITZSIMMONS, Judge, assigning additional reasons.
I write specifically to assign additional reasons.
I note that the issue of the protection that has afforded so many so much under the First Amendment has been considered sparingly by the United States Supreme Court. Rightfully so. Yet the issue of violence is one that has not been squarely submitted to the present Supreme Court for review in this format and intensity.
Where the intentional, deliberative infliction of suffering and agony has the goal of emulation, such a product does not free from the specter of "liability those who would, for profit or other motive, intentionally assist and encourage crime and then shamelessly seek refuge in the sanctuary of the First Amendment." Rice v. Paladin Enterprises, Incorporated, 128 F.3d 233, 248 (4th Cir. 1997), cert. denied, 118 S.Ct. 1515, 140 L.Ed.2d 668 (1998).
NOTES
[1] Judge Remy Chiasson, retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] This petition was filed on behalf of Patsy Byers, her husband and their three children. While this appeal was pending, Patsy Byers died. Her estate has been substituted as a plaintiff in her petition. For purposes of this appeal, we will refer to all of the plaintiffs collectively as Byers.
[3] Byers subsequently obtained an order which voluntarily dismissed Regency Enterprises from the suit without prejudice.
[4] The Hollywood Defendants are the same defendants who will be subsequently identified as the Warner Defendants.
[5] The reasons for judgment issued in conjunction with the trial court's ruling on the peremptory exceptions raising the objections of no cause of action indicate that "[o]ther pending exceptions were deferred until the rulings on the present issues." The record does not otherwise reflect the disposition of this motion to strike.
[6] In this exception, the Warner Defendants stated that Jane and Don Productions, Inc., was incorrectly named in the petition as J.D. Productions; and that Alcor Film & TV GMBH & Co. Produktions KG was incorrectly named in the petition as Alcor Films.
[7] At oral argument, counsel for Byers acknowledged that he had to abandon the subliminal message allegations in the petition because an examination of the "Natural Born Killers" video by Byers' expert failed to reveal the presence of the type of subliminal messages alleged in the petition. Thus, for purposes of this appeal, we will ignore the subliminal message allegations contained in the petition.
[8] Specifically, the judgment dismissed the suit as to Byers' claims against defendants TWEC, Alcor Film & TV GMBH & Co. Produktions KG, Jane and Don Productions, Inc., Oliver Stone and Time Warner, Inc. The judgment did not mention the dismissal of Warner Home Video or Warner Brothers, Inc.
[9] Byers included a copy of the "Natural Born Killers" video with her motion for new trial in the event the court determined a duty was owed, but still had to reach the constitutional question of protection under the First Amendment. This video is attached as an exhibit to the record on appeal. However, we will not consider the video since evidence is generally not admissible on an exception raising the objection of no cause of action unless the pleadings are expanded through the admission of the evidence by the trial court without objection from the other party. Treasure Chest Casino, L.L.C. v. Parish of Jefferson, 96-1010, p. 5 (La.App. 1st Cir. 3/27/97), 691 So.2d 751, 754, writ denied, 97-1066 (La.6/13/97), 695 So.2d 982. In the present case, there is nothing in the record to indicate that the video was admitted into evidence by the trial court. Additionally, in their brief, the Warner defendants contend that the video is improperly part of the record; thus, it is apparent that if plaintiff had attempted to introduce the video at the hearing, the attempt would have been met with an objection from the Warner defendants.
[10] In their memoranda to the trial court, both Byers and the Warner defendants acknowledge that decisions of other courts relating to questions of duty are persuasive to Louisiana courts faced with similar questions, relying on Barrie v. V.P. Exterminators, Inc., 625 So.2d 1007 (La. 1993).